## UNITED STATES BANKRUPTCY COURT
## WESTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| In re: | Case No. 14-07970 |
| DAVID W. CHARRON | Chapter 7 |
| Debtor. | Honorable James W. Boyd |

| | |
|---|---|
| GLENN S. MORRIS and THE GLENN S. MORRIS TRUST, | Adversary Proceeding No. 15-80086-JWB |
| Plaintiffs, | |
| v | |
| DAVID W. CHARRON, | |
| Defendant. | |

| | |
|---|---|
| Ronald J. Spinner (P73198) | Perry G. Pastula ( P35588) |
| Eric D. Carlson (P60277) | Dunn, Schouten & Snoap, PC |
| Stanley J. Stek (P29332) | Attorneys for Debtor David W. Charron |
| Miller, Canfield, Paddock and Stone, PLC | 2745 DeHoop Ave SW |
| Attorneys for Plaintiffs Glenn S. Morris and | Wyoming, MI   49509 |
| The Glenn S Morris Trust | (616) 538-6380 |
| 150 West Jefferson, Suite 2500 | |
| Detroit, MI   48226 | |
| (313) 496-7829 | |

## DEFENDANT/DEBTOR DAVID W. CHARRON'S REPLY TO COUNTER-MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM IN SUPPORT THEREOF

David W. Charron (the "Debtor"), by and through his counsel, Dunn, Schouten & Snoap, P.C., hereby requests that the Court deny Plaintiff Glenn S. Morris and the Glenn S. Morris Trust's (collectively the "Plaintiffs") Counter-Motion for Summary Disposition.  In support of the motion, the Debtor respectfully refers the Court to the attached memorandum.

# **TABLE OF CONTENTS**

INDEX OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  ii

STATEMENT OF DISPUTED MATERIAL FACTS.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

      I.      No Injury to Another Entity or Property Caused by Debtor.. . . . . . . . . . . . . . . . 14

      II.     No Willful and Malicious Action by Debtor.. . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

      III.    There Was Justification for the Debtor's Behavior. . . . . . . . . . . . . . . . . . . . . . . . 22

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

# INDEX OF AUTHORITIES

**Cases**                                                                      **Pages**

*Additive Controls & Measurement Systems, Inc. v Flowdata, Inc.,*
96 F.3d 1390, 1394 (Fed.Cir.1996).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Alemite Mfg Corp. v. Staff*, 42 F.2d 832, 833 (2d Cir. 1930). . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Alliance for the Mentally Ill of Mich v Dep't of Community Health*, 231 Mich App 647,
600-661; 588 N.W.2d 133 (1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*In re Behn,* 242 B.R. 229 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18-20

*Cohen v. de la Cruz*, 523 US 213 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 19

*Davis v City of Detroit Financial Review Team*, 269 Mich App 568; 821 NW2d 896 (2012). 6, 14

*Kawaauhau v. Geiger*, 523 U.S. 57, 61; 118 S.Ct. 974 (1998); *In Re Kimzey*, 761 F.2d 421,
424 (7th Cir.1985).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14-15

*In Re Kimzey*, 761 F.2d 421, 424 (7th Cir.1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .14

*Mich. State Employees Ass'n v Dep't of Mental Health*, 421 Mich 152, 157-158;
365 N.W.2d 93 (1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*In re Moroun,* 295 Mich App 312. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Musilli v. Droomers (In re Musilli)*, 2010 WL 2222806 (6th Cir 2010).. . . . . . . . . . . . . 16-18, 22

*New York ex rel. Vacco v. Oper. Rescue Nat'l*, 80 F.3d 64, 70 (2d Cir. 1996). . . . . . . . . . . . . . 23

*Pontiac Fire Fighters Union Local 276 v City of Pontiac*, 482 Mich 1, 10-11,
753 N.W.2d 595 (2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Saga International, Inc. v John D. Brush & Co.,* Inc., 984 F. Supp. 1283 (C.D.Cal.1997).. . . . . 23

*Sampson v. Murray*, 415 U.S. 61, 86-88; 94 S.Ct. 937 (1974) . . . . . . . . . . . . . . . . . . . . . . . . .17

*Suarez v. Barret (In re Saurez)*, 400 B. R. 732 (B.A.P. 9th Cir. 2009).. . . . . . . . . . . . . . . . . . . 15

*Smith v Khouri*, 481 Mich 519; 751 NW2d 472 (2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Worgress Insurance Agency v. Auto-Owners*, 269 Mich. App. 538,
544; 239 N.W.2d 417 (1976). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

**Statutes**

11 U.S.C. § 523 (a)(6). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 13-16

**Rules**

MCR. 3.310( c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 8, 10, 18, 22, 23, 24

Rule 65(d) F.R. Civ P.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 19, 20, 23, 24

## STATEMENT OF DISPUTED MATERIAL FACTS

The Plaintiffs' Counter Motion for Summary Judgment ("CMJ") is dominated by false, derogatory and misleading factual statements without specific page references to the transcripts, pleadings, opinions, or other documentary  filed with the Kent County Circuit Court (the "Circuit Court") or the Michigan Court of Appeals (collectively the "State Courts"); no affidavits accompany it.[1]    The Debtor disputes the following allegations:

1.        *"The protective order against Morris, Schnoor & Gremel, Inc., was designed to preserve assets of an entity undergoing dissolution." (CMJ, p. 1).*

The one sentence protective order (the "Injunction") ***was not issued against Morris, Schnoor & Gremel, Inc.*** ("MSG" or the "Corporation"). It was issued solely against R. Judd Schnoor ("Schnoor"), a shareholder of MSG.   The Injunction appeared at the bottom of an "Order Directing Defendants to Produce Financial Statements":

> "IT IS FURTHER ORDERED that Defendant R. Judd Schnoor shall produce to Plaintiff Glenn S. Morris all of the personal financial information described during the court hearing by August 22, 2008. IT IS FURTHER ORDERED **that Defendant R. Judd Schnoor shall not transfer the assets of Morris, Schnoor & Gremel, Inc., outside of the ordinary course of business without authorization from the Court**." (*See* **Exhibit 1**, Emphasis added).

The law firm of Charron & Hanisch, PLC ("C&H" or the "law firm"), derived its security interest in the assets of MSG from the Corporation, not Schnoor. The absence of MSG from the

---

[1] The Debtor relied solely upon the State Court's Opinions for its Motion for Summary Judgment. In response to the Plaintiffs CMJ, the Debtor is relying upon the Opinions, transcripts and trial exhibits from Kent County Circuit Court Case No. 07-06441 and 09-01878, as well as the affidavit of the Debtor. This is to provide context and assist the Court in its determination.

Injunction is conspicuous, as the Corporation was directed to do other things in the Order. *Id.*

The Injunction **was not "designed to preserve the assets of an entity undergoing dissolution**." Prior to Kent County Circuit Court Case No. 07-006441-CR, Schnoor and Plaintiff Glenn S. Morris ("Morris") were equal owners of MSG — an insurance company in Rockford, Michigan (*See* Exhibit B to the Debtor's Motion for Summary Judgment, p. 2). When they fell into disagreement on the direction of the Corporation, Schnoor offered to buy Morris out under the terms of their executed stock purchase agreement; Morris refused, secretly set up a competing insurance agency and filed for corporate dissolution of MSG. *Id.*[2] Within sixty (60) days of its filing, the Circuit Court dismissed Morris' complaint with prejudice, and granted Schnoor's counterclaim for breach of contract and specific performance of the stock purchase agreement (*See* **Exhibit 2**, p. 7-8). The Circuit Court ordered Morris to sell his interest in MSG to Schnoor for $2,500,000. *Id.* Thereafter, the parties only awaited a damage trial for Morris' breach of contract. *Id.*

Morris never sought a stay of enforcement of the Order. The court ordered sale occurred on October 26, 2007: Morris delivered his stock to Schnoor in exchange for $235,804 in cash and a promissory note in the amount of $2,264,196, payable at a rate of $45,091 a month for five years (the "Note")(*See* **Exhibit 4**). Schnoor pledged the stock he received from Morris to secure the payment of the Note (the "Stock Security Interest"). *Id.*

Within weeks of the Circuit Court's opinion, Morris had phoned all of his major clients and advised them that his father's company had been stolen by Schnoor (*See* **Exhibit 5**). He then visited the office of several of his former clients and outright solicited their business (*See* **Exhibit 6**). Morris also used MSG staff members — who were loyal to him — to secretly funnel clients to his new

---

[2] *See also* **Exhibit 2**, Opinion, 8/22/07, p. 1; **Exhibit 3**.

agency. Former MSG clients reported that these employees contacted them after business hours or spoke in hush tones on their cell phones, and directed them to contact Morris for their insurance needs.[3] In December of 2007, these employees quit and went to work for Morris' new agency.[4]

Shortly thereafter, Morris' former clients began to leave MSG *en masse*, in the middle of their policy periods and without notice to MSG. By March of 2008, more than thirty five percent (35%) of Morris' former clients had left MSG; within six months, almost all had relocated to Morris' new agency (*See* **Exhibit 9**). The lost income from these clients represented almost forty percent (40%) of the annual gross income of MSG. *Id*. This rapid loss of income, coupled with the Corporation's huge fixed costs — arising from its relocation into the Promenade office building in Rockford — and extraordinary litigation expenses, would eventually prove fatal to the Corporation.

Schnoor responded to the skulduggery by ceasing to make installment payments on the Note; by that time, he had paid Morris $416,170.96 (*See* **Exhibit 24, page 223**). On February 27, 2008, Schnoor and MSG (collectively the "Counter-Plaintiffs") filed an amended complaint alleging various torts against Morris (*See* **Exhibit 11**).[5] They also requested an injunction to prevent Morris from soliciting the remaining clients of MSG (*See* **Exhibit 12**). The Circuit Court denied the request as premature due to the lack of evidence (at the time) that Morris or his agents had solicited the clients or acted unlawfully. *Id*. The Circuit Court instructed the Counter-Plaintiffs to conduct discovery and return with concrete evidence of Morris' wrongdoing. *Id*.

---

[3] *See* **Exhibit 7**.

[4] *See* **Exhibit 8**.

[5] There was an implied, in law covenant that Morris would not solicit back his former clients if he expected to be paid. *Worgress Insurance Agency v. Auto-Owners*, 269 Mich. App. 538, 544; 239 N.W.2d 417 (1976).

MSG asked C&H to perform sixty three (63) depositions of the departed clients for this purpose. At the time, the Corporation was indebted to the law firm in the amount of $286,730.95 for the six matters it was handling (*See* **Exhibit 14**). C&H was reluctant to undertake additional work without assurance of payment. *(See* **Exhibit 15).**

To induce the law firm to perform additional work, MSG offered C&H a ***junior*** security interest in its personal property on May 22, 2008 (the "Security Interest")(*See* **Exhibit 14**).[6] The Security Interest secured the repayment of existing fees, as well as future fees of MSG. *Id*. The law firm perfected the Security Interest on June 8, 2008 by filing a UCC financing statement with the Secretary of State for the State of Michigan. *Id*. MSG promised to keep current on future billings, while making progress payments on the past debt (*See* **Exhibit 15**). C&H continued its representation in reliance upon the Security Interest and promises of payment. *Id*.

2.      *"The parties agreed to entry of a protective restraining order while the State Court considered the matter, and thus, two days later, the State Court entered an order[.]" (CMJ, p. 3).*

As discussed briefly in section "1", the Injunction did not arise during the Circuit Court's consideration of the dissolution request, but rather as part of an attempt by the Plaintiffs to hold Schnoor in contempt for failing to make payments on the Note. The Plaintiffs had no right to demand dissolution after they were no longer shareholders of MSG.   The Plaintiffs did, however, hold a collateral assignment of MSG stock as security for the repayment of the Note.   The Plaintiffs never foreclosed against the stock they held as security.

In response to Schnoor's refusal to pay on the Note, Morris filed a "Motion for Specific

---

[6] The State Courts omit that C&H held a ***junior lien***. It was subject to a first priority lien granted to Fifth Third Bank to secure MSG's $400,000 line of credit. *Id*.

Performance of the Schnoor Promissory Note."Schnoor objected on the basis that: (1) Morris had

no plead claims; (2) Morris had an adequate remedy at law that barred equitable relief; (3) Morris'

unlawful solicitation barred equitable relief; and (4) Schnoor had properly plead set-off claims that

defeated Morris' claim (*See* **Exhibit 16**). Notwithstanding, a new trial court judge granted the

motion and entered an order compelling Schnoor to make payments on the Note (*See* **Exhibit 17**).

C&H counseled Schnoor to make payments to avoid contempt sanctions (*See* **Exhibit 18**).

Schnoor did not have the ability to pay Morris without the cash flow from the clients that had left

for Morris' new agency. *Id*. C&H attempted to get Schnoor's business acquaintances to purchase the

stock or assets of MSG, or loan money to Schnoor to fund the Note payments until trial. *Id.* No one

was interested. *Id*. Schnoor would not sell the assets of MSG, as he believed he would ultimately be

successful at trial and wanted the Corporation to remain intact. *Id*.

One week after the order to specifically enforcing payments on the Note, the Circuit Court

issued an "Ex Parte Order to Show Cause Why R. Judd Schnoor Should Not Be Held In Civil

Contempt." An evidentiary hearing[7] commenced on August 22, 2008 and continued for three days;

at the conclusion, the Circuit Court dismissed the order to show cause on the basis that Schnoor did

not have the money to make payments and Morris had an adequate remedy at law that barred the

relief he sought (*See* **Exhibit 20**).

The Injunction arose at the end of the first day of the unsuccessful contempt action, entirely

from the following discourse:

"Mr. Stek:     I want an order that precludes **him**  from engaging in any out of the ordinary
                business activity, and no transfers of business interests, or activity, or assets

---

[7] The Security Interest between MSG and C&H was the subject of testimony (*See* **Exhibit 19**) and all security instruments were furnished to the Plaintiffs. *Id*.

in the meantime.

The Court:    Any objection to maintaining the status quo **for a week or two**?

Mr. Charron:    **Not for a week or two**, your Honor."[8]

There was **never** any request to impose the Injunction against anyone other than Schnoor. There was never consent "by the parties" to extend the duration of the Injunction for longer than a "week or two." The Circuit Court drafted the order and ignored the limitations of the stipulation.

The Circuit Court made no fact findings pursuant to MCR 3.310 ( c ), nor did it Identify any reasons why the Plaintiffs were entitled to an Injunction. Michigan courts use a four factor test to determine the appropriateness of injunctive relief; in relation to the action, the Injunction should have included an analysis on: (1) the likelihood that Morris would prevail on the merits against Schnoor, (2) the danger that Morris would suffer irreparable harm if the Injunction was not issued, (3) the risk that Morris would be harmed more by the absence of the Injunction than Schnoor would be by the granting of the relief, and (4) the harm to the public interest if the Injunction was not issued. *Id*.[9]  The Circuit Court made no analysis on any of these factors (*See* **Exhibit 1**).

The Circuit Court eventually dismissed the contempt action on the basis that Morris had an adequate remedy at law that barred equitable relief; the same reasoning would have barred the issuance from the offset if the Circuit Court applied the four factor test.

---

[8] (*See* **Exhibit 21**). The "him" is a plain reference to Defendant Schnoor, the party who was the subject of the contempt hearing. *Id*.

[9] *Davis v City of Detroit Financial Review Team,* 296 Mich App 568, 613; 821 N.W.2d 896 (2012); *Alliance for the Mentally Ill of Mich v Dep't of Community Health*, 231 Mich App 647, 600-661; 588 N.W.2d 133 (1998); *Mich. State Employees Ass'n v Dep't of Mental Health*, 421 Mich 152, 157-158; 365 N.W.2d 93 (1984); and *Pontiac Fire Fighters Union Local 276 v City of Pontiac*, 482 Mich 1, 10-11, 753 N.W.2d 595 (2008).

-6-

Schnoor never appealed the improper issuance of the Injunction, nor any of the other unusual things which subsequently occurred in the action.[10]   Schnoor fled for Bankruptcy Court protection on January 28, 2009 and received a discharge on May 17, 2010 (*See* **Exhibit 22**).   No one took action to gather, preserve or present evidence of the Plaintiffs' wrongdoing, nor appeal any of the rulings which lead to relief being granted to the Plaintiffs.   The trustee eventually sold Schnoor's claim to the Plaintiffs for approximately $10,000 (*See* **Exhibit 23**), and they quickly dismissed the action against themselves.

3.      *"[T]he state court order specifically identified the conduct that would be harmful, the Debtor's violation of that order was certain to cause harm." (CMJ, p. 1).*

The only conduct identified by the Injunction was a sale of MSG assets by Schnoor. It is unclear from the one sentence Injunction what other harms the Circuit Court intended to prevent, or why a non-party to the contempt action would be subject to the Injunction (*See* **Exhibit 1**) as long as they did not aid or abet Schnoor to undertake the prohibited act on his behalf.

Schnoor's refusal to pay on the Note triggered an "Ex Parte Order to Show Cause Why R. Judd Schnoor Should Not Be Held In Civil Contempt." The hearing that followed dealt with Schnoor's payment obligation to the Plaintiffs and whether Schnoor should be held in contempt. The Injunction only identified behavior by Schnoor that was restrained. *Id*. The Debtor never believed the Injunction was applicable to the Security Interest of C&H (*See* **Exhibit A**, **Exhibit 24**).  The Debtor believed C&H had independent rights against the Corporation's assets that evolved during

---

[10] The Counter-Plaintiffs discovered that the Circuit Court ignored the stipulation more than two months after the restraint should have lapsed; C&H and the Debtor did not correct the Circuit Court on C&H's behalf because they never considered themselves restrained by the Injunction (*See* **Exhibit A**, Affidavit).

the normal course of MSG's business — to ensure legal representation — three months before the issuance of the Injunction.[11] *Id*. The Debtor believed it was permissible for the law firm to act in its own self interest and to keep all of the benefits it received from doing so. *Id*.

It was not until the Circuit Court abandonned the common law and developed its unique interpretation of MCR 3.310(C)(4) that C&H and the Debtor realized the Injunction could be applicable to C&H's sale of MSG's assets.

     3.    *"The Debtor...acknowledged that the Restraining Order prevented any transfers, though, by this time, the assets were already gone."*

The Debtor never acknowledged that the Injunction prevented ***any transfers of MSG's assets*** (*See* **Exhibit A**). The Debtor consistently maintained that the injunction prevented ***the transfer of MSG assets by Schnoor or at Schnoor's direction*** (*See* **Exhibit 24**). Schnoor had no intention of transferring, did not transfer and never instructed C&H to transfer the assets of MSG (*See* **Exhibit A**)[12]. Schnoor did not want C&H to transfer the assets (*See* **Exhibit 25**). Schnoor was never tried for contempt involving the Injunction.

In mid-December of 2008, the Plaintiffs learned from another insurance company representative that the assets of MSG had been transferred to a new agency. The Plaintiffs' counsel emailed the Debtor and alleged that he had evidence that Schnoor had violated the Injunction; the Debtor invited the Plaintiffs to schedule an evidentiary hearing and present proofs (*See* **Exhibit 26**).

Neither the Debtor or C&H ever denied that a transfer of MSG's assets had occurred by

---

[11]The Counter-Plaintiffs did not discover the restraining order did not lapse until two months after it should have lapsed (*See* Exhibit H to the Debtor's Motion for Summary Judgment, p. 8).

[12] There is no trial exhibits that contain a directive from Schnoor to transfer the assets, nor did any part testify at trial that they received such directive.

-8-

C&H.  Shortly after the sale, the Debtor testified extensively about the transfer of MSG's assets and furnished the Circuit Court with complete copies of the purchase and transfer documents (*See* **Exhibit 27**). The Circuit Court found nothing objectionable. Five years later, the same documents lead the Circuit Court to conclude C&H and the Debtor acted contemptuously when C&H conducted its Article 9 sale.

      4.      *"[The Debtor] knowingly violated a restraining order by a state court." (CMJ, p. 1).*

The Debtor testified that he did not believe the Injunction was applicable to C&H, Fifth Third Bank, the Debtor or any party besides Schnoor (*See* **Exhibit A**; **Exhibit 24**).  He did not know he was subject to the Injunction and he did not knowingly violate it.

In the post-2012 contempt opinions, both the Circuit Court and the Michigan Court of Appeals acknowledge that the Debtor and C&H did not believe their actions violated the Injunction (*See* Exhibit H to the Debtor's Motion for Summary Disposition).[13] The Michigan Court of Appeals summarized it as follows:

> "[The Debtor] and [C&H] contend that the injunctive order was applicable only to Schnoor, because MSG, [the Debtor], and [C&H] were not named or included in the order's restrictions. [The Debtor] and [C&H] also take issue with any determination by the trial court that Schnoor actually violated the court order, asserting the lack of any evidence suggesting that Schnoor actively participated or had involvement in the selling of MSG's assets to NYPIA. A particular and repetitive point of contention in the lower court by [the Debtor] was the legitimate transfer of a security interest in MSG's assets for outstanding attorney fees in May, 2008, months before the injunctive order was issued, and that the subsequent sale and liquidation of those assets was effectuated by [C&H], an entity not identified or named in the injunctive order." *See* Exhibit H to the Debtor's Motion for Summary Disposition*, p. 5.
>
>            ****
>
> "[t]he trial court's reference to the December 2008 exchange <u>comprised merely an</u> <u>observation that [the Debtor] did not view his behavior as being in violation of the</u>

---

[13] "The Court need not excuse [the Debtor and C&H's] actions...merely because of some purported infirmity in the order[.]" (*See* Exhibit B to the Debtor's Motion for Summary Judgment, p. 9).

order. [The Debtor]'s subjective view of his behavior is irrelevant because, "a finding of willful disobedience of a court order is not necessary for a finding of civil contempt."" *Id.* p. 9 (Emphasis added).

The Circuit Court determined: (1) the Debtor knew of the Injunction against Schnoor; (2) C&H performed a transfer of MSG's assets; (3) MCR 3.310(C)(4)[14] "binds parties and their attorneys alike"; and (4) as a result, the asset transfer occurred in violation of the Injunction (*See* Exhibit B to Debtor's Motion for Summary Disposition, p. 15). The Debtor's subjective intent was irrelevant. In other words, C&H was bound by the Injunction regardless of its purpose or intent in performing the Article 9 sale.

On appeal, the Debtor and C&H argued that the Circuit Court's novel interpretation of MCR 3.310(C)(4) should be rejected in favor of an interpretation which was consistent with Federal Rule of Civil Procedure 65(d).[15] A third party is only liable under FRCP if he acted as the agent of the party to accomplish the acts prohibited by the injunction for the restrained party, so called "aiding and abetting."(*See* **Exhibit A**). The Michigan Court of Appeals rejected this approach, finding that "showing of willful disobedience" was not a requirement for contempt. The Michigan Court of Appeals also refused a request to publish the opinion, leaving the outcome only binding on the parties to the action for stare decisis purposes.

5.      *"[The Debtor] knew the [Plaintiffs]...would be injured." (CMJ, p. 1); "Plaintiff*

---

[14] It provides: "An order granting an injunction or restraining order: (4) is binding only on the parties to an action, their officers, agents, servants, employees, and attorneys, and on those person in active concert or participation with them who receive actual notice of the order by personal service or otherwise." MCR 3.310(C)(4).

[15] FRCP 65(d)(2) provides: "**Persons Bound.** The order binds only the following who receive actual notice of it by personal service or otherwise: **(A)** the parties; **(B)** the parties' officers, agents, servants, employees, and attorneys; and **(C)** other persons who are in active concert or participation with anyone described in Rule 65(d)(2)(A) or (B)."

*Glenn S. Morris suffered losses as a result of the Debtor's actions." (CMJ, p. 1); "The Debtor knew*

*that the transfer of MSG's assets would...render Morris' security interest in MSG's stock worthless."*

There is no factual support for these statements.    It is also contrary to what the Debtor knew and believed.  The moment Morris decided to take back all of his former MSG customers, without giving MSG anything in return, and after collecting $416,170.96 on the Note for such customers from Schnoor, the Plaintiffs irreparably and single handedly destroyed any value of the MSG stock which Plaintiffs held as collateral for the repayment of the Note (*See* **Exhibit A**, **9**).    All of this occurred prior to the Article 9 sale conducted by C&H.  The Debtor testified that he did not believe MSG's stock had any value at the time of the Article 9 sale due to the foregoing. *Id*.

The Opinions are notably devoid of any reference to the Debtor's  "malice" or "intent to cause injury".  The undisputed evidence at trial was that C&H liquidated its security interest in MSG assets to get paid on the Corporation's open account with the law firm.  C&H's debt was undisputed and the Circuit Court said the Article 9 sale was conducted in conformance with the UCC.

The  undisputed  evidence  is  that  C&H  waited  to  enforce  its   security  interest  until  all settlement discussions had ended between the Plaintiffs and the Counter-Defendants; C&H had maxed out its credit lines with institutional lenders to maintain the litigation against the Plaintiffs; the debt of the secured creditor, Fifth Third Bank, which was senior to C&H's debt,  was about to balloon and if foreclosed, would extinguish C&H's junior lien; and world capital markets had collapsed and froze during the Fall of 2008 in what is colloquially called the "Great Recession". C&H waited to liquidate its collateral until Morris' legal counsel informed the Debtor that his office would make sure that if Schnoor filed for bankruptcy protection that C&H would never get paid on

its MSG receivable.[16]

6.      *"[A]ll appeals of the State Court Cases have been completed, rendering them final and unalterable." (CMJ, p. 2).*

The Plaintiffs' statement is half true. An opinion and order establishing liability for contempt was entered on December 27, 2012 and it was immediately appealed by the Debtor to the Michigan Court of Appeals ("COA") on February 26, 2013 (COA 315006), despite the fact that a "final order" had not been entered to close the case.[17] The COA joined the matter with other appeals that had been scheduled for an expedited hearing (31574 and 315702). While the first consolidated appeal was progressing on the issue of liability, the Circuit Court conducted a series of hearings to determine the amount of attorney fee award for the contempt sanction. The Circuit Court subsequently concluded the amount of the award against the Debtor is $363,506.77, minus a $22,443.77 offer of judgment sanction (*See* Exhibit C to the Plaintiffs' Complaint) on January 28, 2014.

The initial contempt opinion was affirmed on appeal (*See* Exhibit H to the Debtor's Motion for Summary Disposition) on May 28, 2014. The amount of the attorney fee award is currently the subject of an appeal to the COA identified as Case No. 321925, filed on December 2, 2013. The Debtor filed for Chapter 7 bankruptcy protection on December 30, 2014. The COA stayed the Debtor's appeal following the filing of the petition. If the Plaintiffs' Complaint to Object to

---

[16]The communication stated: "Clearly only Glenn [Morris] can convert Judd's half interest in the Agency which is not secured by Glenn's note, into value. In other words, in bankruptcy we believe [sic] we would likely end up with the entire corporation (or more likely components [sic] of it since we do not want the debts to you or Judd) as a consequence of negotiations with the Trustee." (Emphasis added).

[17]This practice is authorized by *In re Moroun,* 295 Mich App 312, 330-331 (2012), citing *Droomers v. Parnell,* unpublished opinion per curiam of the Court of Appeals, issued June 30, 2005 and *In re Radulovich*, unpublished opinion per curiam of the Court of Appeals issued April 10, 2001 (Docket No. 210779, 2001 WL 689558

-12-

Discharge is not dismissed, the Debtor plans to continue the appeal in Case No. 321925 for the purpose of reducing the amount of the Award.

<u>**INTRODUCTION**</u>

The Plaintiffs seek summary judgment on their Complaint Objecting to Discharge ("the <u>Complaint</u>") for an award of attorney fees and costs[18] against the Debtor (the "<u>Award</u>") in Circuit Court Case No. 07-6441-CR (the "<u>Contempt Case</u>"). The Plaintiffs' Complaint alleges:

> "93.   [The Plaintiffs'] security interest in MSG's stock constitutes a <u>property</u> interest

.

> 94.   [The Debtor] thus willfully and maliciously caused injury to [the Plaintiffs'] <u>property</u>.
> ****
> 96.   Because [the Debtor] willfully and maliciously caused injury to [the Plaintiffs'] <u>property</u>, [the Debtor] is not entitled to a discharge pursuant to 11 U.S.C. § 523(a)(6)." (*See* Complaint, p. 10-11)(Emphasis added).

The Debtor did not file an answer to the Complaint.  Instead, it filed a motion seeking summary disposition of the Complaint on the basis that the Circuit Court ruled the Award did not involve "damages for personal injury, property damage, or wrongful death" to the Plaintiffs  (*See* **Exhibit D** to the Debtor's Motion for Summary Judgment, pp 2-3; **Exhibit E** to the Debtor's Motion for Summary Judgment, p. 4), and injury to persons or property is necessary element of an action under 11 U.S.C. § 523(a)(6). Moreover, the Plaintiffs sued the Debtor for these injuries in Circuit Court Case No  09-01878-CB, and COA Case No. 315007 and 315742 and lost, thus precluding further litigation of the matter under principals of collateral estoppel and res judicata.

The Plaintiffs' current motion fails for the same reason stated in the Debtor's summary judgment motion, namely, the Circuit Court held that the Award does not represent compensation

---

[18] The Award totaled $363,506.77; it was offset by an offer of judgment sanction in Case No. 09-01878-CB in the amount of $22,443.77 (*See* **Exhibit A, B and C** to the Debtor's Motion for Summary Judgment.

-13-

for injury to the Plaintiffs or their property (*See* **Exhibits D and E** to the Debtor's Motion for Summary Judgment). The Plaintiffs' motion also fails because the Award is devoid of rulings or evidence that the Debtor's actions were <u>willful</u> and <u>malicious</u>, or in any way calculated to injure the Plaintiffs or their security interest in MSG's stock. These allegations are contrary to the record of the Contempt Case and absent from the Opinions.   At all relevant times prior to the sale of MSG assets, the Debtor believed, with good cause, that the Plaintiffs' stock interest in MSG was worthless and unaffected by the MSG asset sale.

## ARGUMENT

The Plaintiffs' Motion for Summary Judgment  fails to satisfy the requirements for a non-dischargeability claim premised upon of 11 U.S.C. § 523 (a)(6).[19]  For the Plaintiffs to succeed, they must demonstrate that the Debtor's actions were: (1) willful, (2) malicious and (3) result in injury to another entity or the property of another entity. *Id*.; *Kawaauhau v. Geiger*, 523 U.S. 57, 61; 118 S.Ct. 974 (1998); *In Re Kimzey*, 761 F.2d 421, 424 (7th Cir.1985).

**I.      No Injury to Another Entity or Property Caused by the Debtor.**

As discussed extensively in the Debtor's concurrent Motion for Summary Judgment, the Award does not represent compensation for injury to the Plaintiff, as alleged by the Complaint.  The Debtor was dismissed by summary disposition from Circuit Court Case No. 09-01878-CB, an action seeking relief for such injuries to Plaintiffs, and the dismissal was affirmed on appeal  (*See* Exhibit H to the Debtor's Motion for Summary Disposition).   The Circuit Court held others responsible for the injuries the Plaintiff alleges in the Complaint.  The Circuit Court characterized the Award against the Debtor as an exercise of the courts inherent authority to award costs as a contempt sanction under

---

[19](Complaint, ¶ 94-97)

the holding of *Davis v. City of Detroit Fin. Review Team*, 296 Mich. App. 568, 626; 821 N.W.2d 896 (2012). The Bankruptcy Code does not exempt contempt sanctions like this from discharge when they are payable to a non-governmental party.

The cases of *Cohen v. de la Cruz*, 523 US 213 (1998) and *Suarez v. Barret (In re Suarez)*, 400 B. R. 732 (B.A.P. 9th Cir. 2009), cited by Plaintiffs, do not change this outcome.   Both *Cohen* and *Suarez* involve situations where the trial court determined the contemnor had caused personal injury or property damage to the party protected by the injunction.   The issue in *Cohen*, a fraud case, was whether statutory treble damages associated and attorneys fees associated with a rent control ordinance were non-dischargeable.   The Supreme Court said they were part of the same debt as the non-dischargeable compensatory damage award for fraud.   The issue in *Suarez* was whether an award of statutory attorneys fees for the violation of an a non-contact injunction was non-dischargeable, after a contemnor repeatedly violated the injunction and served jail time.    The California court deemed the debtor's extreme behavior to be willfully and maliciously aimed at the protected party, and substantially certain to cause the injury the protected party suffered.

## II.        No Willful and Malicious Action By the Debtor.

The Plaintiff's current motion fails because the Plaintiffs provide no evidence that the Debtor willed or desired harm to the Plaintiffs, or that harm to the Plaintiffs was substantially certain as a result of the Debtor's behavior to participate in the MSG asset sale.

The Supreme Court analyzed the "willful" component of section 523(a)(6) in Kawaauhau v. Geiger, 523 U.S. 57, 118 S. Ct 974 (1998)(Emphasis added):

> "The word "willful" in (a)(6) modifies the word "injury", <u>indicating that nondischargability takes a deliberate or intentional injury, not merely a deliberative or intentional act that leads to injury.</u>  Had Congress meant to exempt debts resulting from unintentionally inflected injuries, it might have described instead "willful acts

that cause injury". Or, Congress might have selected an additional word or words, i.e., "reckless" or "negligent", to modify "injury". Moreover, as the Eighth Circuit observed, the (a)(6) formulation triggers in the lawyer's mind the category "intentional torts," as distinguished from negligent or reckless torts. Intentional torts generally require that the actor intend "the consequences of an act," not simply "the act itself." Restatement (Second) of Torts, Section 8A, Comment a, p. 15 (1964)."

As restated by the court in *Musilli v. Droomers* (*In re Musilli*), 2010 WL 2222806 (6th Cir 2010): "[f]or the discharge exception under Section 523(a)(6) to apply, a debtor must: (1) will or desire harm[;] or believe injury is substantially certain to occur as a result of his behavior. *Id* at 4.

In *Musilli*, the Sixth Circuit affirmed the bankruptcy court's determination that the debtor and his partner willfully and maliciously harmed the plaintiff when they knowingly violated a court order to escrow funds sufficient to cover a judgment against the law firm. Specifically, the plaintiff claimed that it was entitled to a referral fee and it would be difficult to track said fee if the debtor's law firm distributed the monies to shareholders, in violation of the UFTA. The plaintiff requested that the court place the funds in escrow pending the outcome of the suit.

The court determined that the plaintiff was likely to suffer irreparable harm and enjoined the law firm from transferring any assets until it placed the disputed sum in escrow. The firm never escrowed the funds as ordered, and instead transferred the monies to its shareholders, including the debtor, without obtaining permission from the court.

The state court held a bench trial and entered a judgment in favor of the plaintiff, and against the debtor and its law firm. After a lengthy and complex procedural history in which the debtor violated an agreement and sued for extortion, the Debtor filed for bankruptcy. In affirming the Bankruptcy Court's determination that the debt was nondischargeable, the Sixth Circuit stated:

> We find the <u>court's escrow order made clear "injury [wa]s substantially certain to occur" should Musilli and Baumgarder [the debtors] violate it.</u> *In re: Markowitz*, 190 F. 3d at 465, n. 10. Musilli and Baumgardner point to no facts in the record to refute

this finding.  <u>Despite having clear instructions from the court that the firm was to escrow funds sufficient to cover a judgment against,</u> Musilli and Baumgardner transferred all of the firm's assets away from the firm, including transferring a significant amount of money to themselves.  <u>The appellants directly violated the court order and have offered no legitimate justification that might explain why their actions were not willful and malicious</u>.  Therefore, we affirm the bankruptcy courts grant of summary judgment for Droomers [the plaintiff] on her claim that the debt is nondischargeable under Section 523(a)(6).  *Id* at 6 (Emphasis added).

The facts in the current proceeding are easily distinguishable from the facts in *In re Musilli*. First, the Debtor's conduct did not lead to the issuance of the order in the first place. It was <u>Schnoor</u> who owed the obligation to the Plaintiffs. An order for specific performance was entered against <u>Schnoor</u> and <u>Schnoor</u> did not make payments.[20] The Circuit Court issued a "Ex Parte Order to Show Cause Why <u>R. Judd Schnoor</u> Should Not Be Held In Civil Contempt."   The Plaintiffs asked the court to restrain "him" — <u>Schnoor</u> — from transferring his assets during a  proceeding to determine whether <u>Schnoor</u> should be held in contempt for disobeying the specific performance order.[21] For unknown reasons, the Circuit Court restrained Schnoor from transferring the assets of the Corporation whose stock he owned, rather than his personal assets (the stock of the Corporation, his investments and personal property otherwise seizable by a personal judgment creditor).

At the end of the first day of the Schnoor contempt hearing, the Circuit Court asked the parties to consent to a temporary restraining order with a duration of "a week or two" to maintain the "status quo." After obtaining the consent, the Circuit Court discarded the stipulation and issued

---

[20]This order was dubious because specific performance is an equitable remedy and equitable relief is never granted when a party, such as Plaintiffs, had an adequate remedy at law, such as a money judgment on the Note.

[21]The Plaintiffs were not creditors of the Corporation and held no claim against its assets. They did, however, hold a security interest in half of MSG's stock owned by Schnoor (*See* The Plaintiffs' CMJ, p. 2).

a preliminary injunction against Schnoor.[22]  The Circuit Court never gave its reasons for the Injunction— as required by Michigan Court Rule 3.310 ( c ).[23]  The Plaintiffs had no plead claims against anyone at the time of the Injunction's issuance and, consequently, there was no conceivable way to determine why the relief was granted.

The facts are also distinguishable because the Debtor and C&H were never parties to the action in which the Injunction arose, and they were never restrained by name in the Injunction. They represented the Counter-Defendants as counsel, but never believed the Injunction pertained to them or the Corporation's obligation to C&H under the Security Interest.   Unlike C&H, the Plaintiffs were not creditors of the Corporation. C&H held a valid, perfected security interest against the assets of MSG that was superior to the unsecured interest of the Plaintiffs in the Corporation's stock  (*See* Exhibit H to the Debtor's Motion for Summary Judgment, p. 48-50).

The treatment of the Debtor and C&H differs dramatically from the attorney and law firm in *Musilli*, who knew they were being enjoined and why, due to "clear instructions from the court that the firm was to escrow funds." *Musilli*, 2010 WL 2222806 at 6 (2010). The treatment of the Debtor and C&H also differs from the contemnors in *In re Behm*  242 B.R. 229, 238 (Bankr. W.D. N.Y. 1999), a case which describes the "clear instruction"  requirement as "*telling a specific individual what actions will cross the line into injury to others*".  It is undisputed that the Debtor and C&H were never informed that they were restrained by the Injunction until the Circuit Court held them in contempt four years after the Article 9 sale.   The Counter-Plaintiffs did not discover the

_____

[22] Injunctions without a definite duration are analyzed as a preliminary injunction. *Sampson v. Murray*, 415 U.S. 61, 86-88; 94 S.Ct. 937 (1974).

[23] MCR. 3.310(C) requires that "[a]n injunction or restraining order: (1) **must set forth the reasons for its issuance**."  This reasoning must include rulings upon the four — well known — factors enumerated described in footnote 9.

-18-

restraining order did not lapse until two months after it should have lapsed (*See* Exhibit H to the Debtor's Motion for Summary Judgment, p. 8). Schnoor was the restrained party and he never transferred any assets or MSG in violation of the Injunction, nor was tried for violating the Injunction.

The Plaintiffs next argue that *In re Behn,* 242 B.R. 229 (1999) excuses them from having to demonstrate intent and malice, independently of the contempt finding. *In re Behn* advocates a *per se or ipso facto* approach to non-dischargeability claims involving contempt judgments as long as three criteria are satisfied:

> "Firstly, the injunction or other protective order would, by law, have been issued in a judicial proceeding in which ***the debtor was a party who received at least the protections of Rule 65 F.R.* Civ. P., if not more**. Secondly, the violation was shown to have been intentional. And lastly, the elements of and size of the award were determined in accordance with well settled standards applying to contempts." [emphasis added]

*In re Behn* has not been adopted by the Sixth Circuit. *In re Markowitz*, 190 F.3d 455 (6th Cir.1999). Notwithstanding, the *In re Behn*'s analysis illustrates the impassable problems with the Plaintiffs arguments, as all *required* elements are missing in the present proceeding.

The Debtor (and C&H) were not a party to the action where the Injunction arose; this fact is contrary to every case cited by the Plaintiffs in their motion for summary judgment, including *Cohen* and *Suarez* discussed above. Status as a party is important to non-dischargeability claims. The Debtor (and C&H) were not restrained by name in the Injunction. The Debtor was a person that had knowledge of the order as a result of his position at C&H. As a non-party to the action, the Debtor had different rights and obligations than the parties to the Contempt Action. The Debtor had no right to demand Rule 65 protections for himself, or to object to the form and substance of the Injunction. He had no right to appeal the Injunction. The Debtor was never given a warning or

-19-

opportunity to comply with the Injunction before being penalized.

The reference to receiving the benefits of Rule 65 appears to be a mechanism to insure that the "just" or "unjust" conduct has been adequately defined by the court in order to avoid any misunderstanding about the obligation.    Rule 65(d) F.R. Civ P. provides, in relevant part: "(1) Contents.  Every order granting an injunction and every restraining order must: (A) state the reasons why it issued; (B) state its terms specifically; and ( C ) describe in reasonable details — and not by referring to the complaint or other document — the acts restrained or required."  The one line Injunction does not comply with MCR 3.310©, and it certainly does not comply with Rule 65.  No reasoning was given for the Injunction and there are no specific terms that could reasonably be directed at the Debtor or C&H. It is not obvious from the language of the Injunction or the manner in which it arose, why anyone was bound other than Schnoor.

The *In re Behn* requirement for an "intentional violation" assumes knowledge of the restraining order and the wrongness of one's actions.  If a party such as the Debtor does not know that an injunction applies to it, there is no intentional violation.   The state courts do not require an "intentional violation" to impose contempt liability: mere negligence will suffice. The Debtor testified consistently that it only believed Schnoor was bound by the Injunction.  The Debtor did not act as the agent of Schnoor to undertake the prohibited conduct.

The final elements in relation to the Award also fail the last safeguard of *In re Behn*. The Award is currently the subject a pending appeal which has been stayed by the bankruptcy proceeding. The Opinion and Order Setting Forth Findings of Civil Contempt, dated December 27, 2012 ordered "Attorney Charron to compensate Morris for attorney fees and costs he incurred in the contempt trial

-20-

that took place in 2011." (*See* **Exhibit B** to the Debtor's Motion for Summary Judgment, p. 16; **Exhibit H** to the Debtor's Motion for Summary Judgment, p. 10). The Order left the amount of this award for future determination.

After a hearing which lasted several days, the Circuit Court did not limit the fee award to "the contempt trial that took place in 2011. " It awarded fees for the three years preceding the year of the trial, as well as fees after the trial. The Circuit Court also billed Charron for attorneys fees associated with all three trials involving other parties, and not just the "contempt trial" in which he was involved. Lastly, the Circuit Court treated a rate stipulation under *Smith v Khouri*, 481 Mich 519; 751 NW2d 472 (2008) analysis as a 'floor' for attorneys fees, rather than as a 'ceiling' for the reasonableness of that could be awarded to the Plaintiffs. The Circuit Court awarded attorney Stanley Stek, lead counsel for the Plaintiffs, a fictional hourly rate that was approximately 54% higher than the actual billing rates charged to the Plaintiffs ($385 an hour rather than $250 an hour). As a result, the Plaintiffs received compensation for attorney fees that they never incurred.

None of this was ordinary, usual or proper. Hundreds of thousands of dollars should never have been awarded as the billable time was not incurred by the Plaintiffs during the "contempt trial that took place in 2011." The recent opinion of the COA in Case No. 315006, supports the Debtor's assertion of error:

> "Charron's argument that the time lapse between the trial court and litigants learning of the sale of MSG's assets in December 2008 and the conclusion and ruling of the contempt proceeding has impacted damages suggests a failure to understand both the trial court's contempt opinion and the reasoning followed in determining damages. Charron was held liable for "attorney fees and costs...incurred in the contempt trial." He was not responsible for attorney fees and costs incurred from the sale of the assets to the contempt proceeding. Hence, neither what transpired during this interim period nor the duration between events impacted the sanction." (Court of Appeals Opinion, 5/29/14, p. 10).

-21-

### III.     THERE WAS JUSTIFICATION FOR THE DEBTOR'S BEHAVIOR

The *Musilli* court criticized the Debtor who offered no legitimate justification for why its actions were not willful and malicious.   The Debtor has endless reasons for its actions: (1) the unusual formation of the Injunction; (2) the fact C&H was owed $398,359.91 at the time of the Article 9 sale; (3) C&H held a valid security interest; (4) the Plaintiffs were not creditors of MSG; (5) Schnoor was the only named  restrained party; (5) the Injunction was stipulated to be in effect for two weeks but it lasted indefinitely; (6) no one informed C&H or the Debtor that they were restrained by the Injunction; and (7) C&H believed Morris' security interest in the stock was worthless due to the actions of Plaintiffs, discussed above..  The Debtor also did not know that the Michigan courts would adopt a unique interpretation of MCR 3.310 which abandonned the standard employed in the federal court system and only applied to his case.    The federal standard justified the Debtor's behavior.

The trial court reasoning was facile.  MCR 3.310(C)(4) "binds clients and their attorneys alike", C&H and the Debtor represented Schnoor at the time the injunction issued and, therefore, C&H and the Debtor were restrained from selling the assets of MSG in the same way that Schnoor was prohibited (Original Opinion, 12/27/12, p. 15). The trial court also held that a "finding of willful disobedience of a court order  is not necessary for a finding of civil contempt" and it only had to show C&H and the Debtor  "[were] neglectful or violated [their] duty to obey an order of the court." (Original Opinion, 12/27/12, p. 10-11).   In other words, the Debtor could be found liable for contempt without knowing that he was bound by the Injunction and without intending to violate the

-22-

Injunction. On May 29, 2014, the Court of Appeals affirmed the trial court's reasoning, including its interpretation of MCR 3.310(C)(4).[24] The good news for Michigan jurisprudence is that the Court of Appeals refused to publish their decision, thereby denying it stare decisis status. Only the Debtor has to live with its outcome.

The Debtor argued unsuccessfully that the state courts should interpret MCR 3.310(C)(4) in the same manner that federal courts interpret Rule 65 F R Civ P. The general rule is that "a court may not enter an injunction against a person who has not been made a party to the case before it," *Additive Controls & Measurement Systems, Inc. v Flowdata, Inc.*, 96 F.3d 1390, 1394 (Fed.Cir.1996). Judge Learned Hand's described the purpose and effect of the general rule:

> "[N]o court can make a decree which will bind any one but a party; a court of equity is as much so limited as a court of law; it cannot lawfully enjoin the world at large, no matter how broadly it words its decree. If it assumes to do so, the decree is pro tanto brutum fulmen, and the persons enjoined are free to ignore it. Thus, the **only** occasion when a person not a party may be punished, is when he has helped bring about, not merely what the decree has forbidden, because it may have gone too far, but what it has power to forbid, an act of a party. " *Alemite Mfg Corp. v. Staff*, 42 F.2d 832, 833 (2d Cir. 1930)(Emphasis added).

As the Federal Court in *Saga International, Inc. v John D. Brush & Co.,* Inc., 984 F. Supp. 1283 (C.D.Cal.1997) added:

> "Courts have uniformly held that this language is no more than a way of saying that an injunction binds only the party to the suit, as well as those who aid and abet the party's violation of the injunction...since courts found aiders and abetters liable for helping a party evade an injunction even before Rule 65(d) existed, the language in the Rule about officers, employees, et al., is arguably surplusage. The Rule merely codified the common law practice of refusing to let a party violate an injunction through intermediaries." *Id* at 1286 (emphasis added).

---

[24]The burden of proof utilized by the trial court and Court of Appeals for the civil contempt of an attorney would have been satisfied on February 9, 2009 (Hrg, 2/9/09), when Charron voluntarily disclosed the transaction to the Court. The trial court fails to give Charron any credit for this early disclosure.

The Debtor and C&H also cited *New York ex rel. Vacco v. Oper. Rescue Nat'l*, 80 F.3d 64, 70 (2d

Cir. 1996)(Emphasis added):

> "Having a relationship to an enjoined party of the sort set forth in Rule 65(d) exposes a non-party to contempt for <u>assisting the party to violate the injunction</u>, but does <u>not justify granting injunctive relief against the non-party in its separate capacity</u>." *Id.* at 1395-96 (emphasis added). The Court in *Saga International* concluded that "an officer is bound by an injunction against his corporation *only in his capacity as an officer*." "An injunction issued against a corporation or association binds the agents of that organization to the extent they are acting on behalf of the organization."

The court rejected this analysis in favor of what can only be described as a literal reading of MCR

3.310(C)4 without any historical context about what it means.

This case is devoid of evidence that the Debtor undertook a deliberate or intentional act to

cause harm to Plaintiffs' collateral interest in MSG stock.   The Debtor's motivation in selling the

assets of MSG was to get his law firm paid for work it had performed.   The Debtor reasonably

believed the Plaintiffs' stock interest was worthless before the Article 9 sale due largely in part, to

the actions of Plaintiffs to take forty (40) percent of MSG's annual income stream without giving

the corporation anything in return, and the pending eviction of MSG from its office space.  The state

courts did not conclude that the Debtor was motivated by malice or for the purpose of causing harm

to Plaintiffs' or their security interest in MSG stock.  The Court of Appeals affirmed the trial court

on the basis that the Debtor and C&H  "[were] neglectful or violated [their] duty to obey an order

of the court."

## **CONCLUSION**

For the reasons identified in the motion and this memorandum, the Debtor respectfully requests that the Court deny the Plaintiffs' Motion for Summary Judgment, dismiss the Plaintiffs' Complaint in its entirety, and grant such other and further relief the Court deems just and appropriate.                                        Respectfully submitted,

DUNN, SCHOUTEN & SNOAP PC
Attorneys for the Defendant/Debtor David W. Charron


By:   /s/ Perry G. Pastula
        Perry G. Pastula (P35588)
Business address:
        2745 DeHoop Ave SW
        Grand Rapids, MI   49509
        (616) 538-6380