UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
_____

In re:

DAVID W. CHARRON,

      Debtor.

_____/

GLENN S. MORRIS and THE GLENN S.
MORRIS TRUST,

      Plaintiffs,

v.

DAVID W. CHARRON,

      Defendant.

_____/

Case No: BG 14-07970
Chapter 7

Adversary Proceeding
No. 15-80086

**OPINION DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND
GRANTING PLAINTIFFS' CROSS MOTION FOR SUMMARY JUDGMENT**

Appearances:

Ronald A. Spinner, Esq., Detroit, Michigan, attorney for Glenn S. Morris and the Glenn S.
    Morris Trust, Plaintiffs.

Perry G. Pastula, Esq., Wyoming, Michigan, attorney for David W. Charron, Debtor-
    Defendant.

I.       INTRODUCTION AND ISSUE PRESENTED.

This adversary proceeding arises from prepetition litigation that the Kent County

Circuit Court described as "protracted," "ruinous," and a "testament to the folly of all-out

warfare in the civil justice system."[1] During the course of that litigation, David W. Charron

---

[1] See Opinion and Order Awarding Attorney Fees to the Plaintiff Glenn S. Morris and
Against Attorney David W. Charron, AP Dkt. No 4, Exh. C at 2, 11.

(the "Debtor" or "Attorney Charron"), as lead counsel for one or more of the parties, was held in civil contempt for violating a court order and was ordered to pay Glenn S. Morris (collectively, in his individual capacity and as trustee for The Glenn S. Morris Trust, the "Plaintiff" or "Morris") $363,506.77 in civil contempt sanctions.  In this adversary proceeding, Morris seeks a determination that the civil contempt sanctions are excepted from the Debtor's chapter 7 discharge under § 523(a)(6) of the Bankruptcy Code.[2]

The Debtor has filed a motion for summary judgment, arguing that the contempt award was not compensation for injury to the Plaintiff or his property, and is therefore dischargeable.  The Plaintiff has filed a cross motion for summary judgment, asserting that the state court contempt judgment establishes the "willful" and "malicious" nature of the debt under § 523(a)(6) and the doctrine of collateral estoppel.  For the reasons that follow, the court shall deny the Defendant's motion for summary judgment and grant the Plaintiff's cross motion.

## II.    JURISDICTION.

The court has jurisdiction over this bankruptcy case.  28 U.S.C. § 1334.  The bankruptcy case and all related proceedings have been referred to this court for decision. 28 U.S.C. § 157(a); L. Civ. R. 83.2(a) (W.D. Mich.).  This nondischargeable debt action is a statutory core proceeding and this court has constitutional authority to enter a final order.  28 U.S.C. § 157(b)(2)(I) (determinations as to the dischargeability of certain debts); see, e.g., Hart v. Southern Heritage Bank (In re Hart), 564 F. App'x 773, 776 (6th Cir. Apr. 28, 2014) (unpublished opinion) (notwithstanding the Supreme Court's decision in Stern

---

[2]    The Bankruptcy Code is set forth in 11 U.S.C. §§ 101-1532 inclusive.  Specific provisions of the Bankruptcy Code are referred to in this opinion as "§ ___."

v. Marshall, __ U.S. __, 131 S. Ct. 2594 (2011), the bankruptcy court has "constitutional authority to enter a final money judgment in a dischargeability action"). Further, even Stern claims may be decided by bankruptcy courts if the parties consent. Wellness Int'l Network, Ltd. v. Sharif, __ U.S. __, 135 S. Ct. 1932 (2015). While this is not a Stern claim, the parties have consented to this court entering a final order in this adversary proceeding. See Plaintiff's Complaint, AP Dkt. No. 1 at ¶ 3 (expressly consenting to entry of a final order); Defendant's Motion for Summary Judgment, AP Dkt. No. 4 at 1 & n.1 (stating that this is a core proceeding and referencing Plaintiff's jurisdictional statement).

## III.    FACTS AND PROCEDURAL BACKGROUND.

The contempt order at issue in this adversary proceeding arises from the Debtor's representation of R. Judd Schnoor ("Schnoor") and the insurance agency of Morris, Schnoor & Gremel, Inc. ("MSG") in various state court cases.[3] In July 2007, Morris filed a law suit in the Kent County Circuit Court, seeking dissolution of MSG, an entity which Morris and Schnoor owned as equal partners. (Exh. B at 2; Exh. H at 4.) The state court ultimately ordered Morris to sell his MSG stock to Schnoor for $2.5 million. (Exh. B at 2.) In return, Schnoor gave Morris a down payment of approximately $235,000 and a promissory note for the balance. (Id. at 2-3.) Morris retained a security interest in the MSG stock, but not the company's assets. (Id. at 3.)

---

[3]    The relevant portions of the state court record were attached as exhibits to the Debtor's motion for summary judgment in this adversary proceeding. (See AP Dkt. No. 4.) The exhibits are cited herein as "Exh. __." The majority of this court's factual findings are based on Exh. B. (Kent County Circuit Court Opinion and Order Setting Forth Findings of Civil Contempt, dated December 27, 2012) and Exh. H (Michigan Court of Appeals opinion affirming the circuit court's contempt findings, dated May 29, 2014).

Schnoor made some payments under the promissory note, but eventually became disgruntled with Morris and ceased making payments in the spring of 2008. (Id.) On August 20, 2008, the state court held a hearing to determine whether Schnoor should be held in contempt for his failure to make payments under the promissory note. (Id.) At the hearing, the parties agreed to entry of an order enjoining the transfer of MSG assets. (Id.) The Debtor appeared as counsel for Schnoor at the hearing. (Id.) When the court asked him if he had any objection to "maintaining the status quo for a week or two," the Debtor responded, "Not for a week or two, your Honor." (Id.) Consistent with the parties' agreement, the state court entered an order on August 22, 2008, stating:

> IT IS FURTHER ORDERED that Defendant R. Judd Schnoor shall not transfer assets of Morris, Schnoor & Gremel, Inc., outside the ordinary course of business without authorization from the Court to do so.

(Id. at 4, sometimes referred to herein as the "Injunctive Order".) At a subsequent hearing, counsel for Morris requested that the August 22, 2008, order remain in effect until further order of the court. (Id.) No party, including the Debtor, objected, and the state court granted that request. (Id.) In so doing, the court noted that the Injunctive Order, as originally drafted, did not contain any time restrictions and was intended to continue until the court ordered otherwise. (Id.)

While the state court action against Schnoor remained pending, and despite the court order enjoining the transfer of MSG's assets, Schnoor and the Debtor undertook efforts to sell MSG's assets to a friendly buyer. (Id.) In November 2008, the assets were transferred to New York Private Insurance Agency, LLC ("NYPIA"), in transactions orchestrated by the Debtor and Schnoor. (Id. at 1, 4-6.) The Debtor's law firm, Charron & Hanisch, P.L.C. ("C&H"), "served as a middleman" in the sale by initially taking

possession of MSG's assets pursuant to a security interest C&H held for repayment of attorney's fees.  (Id. at 6.)  After obtaining possession of the assets, C&H sold the assets to NYPIA.  (Id.)  When these transactions occurred, the August 22, 2008, Injunctive Order remained in effect.  (Id. at 6.)

The transfer of the MSG assets triggered much subsequent litigation.  In February 2009, the Plaintiff filed a verified complaint against MSG, C&H, NYPIA, and the Debtor individually in the state court, asserting fraudulent transfer, "commercially unreasonable sale," fraud, and conversion causes of action relating to the transfer of the MSG assets to C&H and/or NYPIA.  (Exh. G.)  The Debtor filed a motion for summary judgment on the claims against him personally, and the state court granted that motion.  The court held that, "[a]lthough Attorney David Charron was integrally involved in the transactions that gave rise to this lawsuit," there was no basis on which to hold the Debtor personally liable for fraud or conversion of the MSG assets.  (Exh. F at 10.)  The dismissal of the claims raised by the Plaintiff against the Debtor in the 2009 lawsuit was upheld on appeal.  (Exh. H.)

In addition, on May 19, 2011, the Kent County Circuit Court entered an order requiring Schnoor, MSG, the Debtor, C&H, and NYPIA to show cause why they should not be held in civil contempt for violating the Injunctive Order.  (Exh. B at 1.)  After holding a hearing and considering the parties' arguments, the state court issued a detailed Opinion and Order Setting Forth Findings of Civil Contempt against the Debtor, MSG, and C&H (the "Contempt Opinion").[4]  (Exh. B.)

---

[4]    The state court noted that Schnoor filed a bankruptcy case on January 28, 2009, and therefore was "shielded from civil liability" in the contempt action.  (Exh. B at 1.)

In the Contempt Opinion, the state court specifically stated that it viewed the Debtor's possible violations of the Injunctive Order as being in the nature of civil contempt. (Id. at 10.)  As to the applicable legal standard for a finding of civil contempt, the opinion explained that Michigan law requires "clear and unequivocal" proof of the contempt, but does not require a "finding of willful disobedience of a court order."  (Id. (citing In re Contempt of Robertson, 209 Mich. App. 433, 439 (1995) and Davis v. Detroit Fin. Review Team, 296 Mich. App. 568, 625 (2012).)   Instead, the court indicated that to hold a party in civil contempt, it only needed to "'find that the [alleged contemnor] was neglectful or violated its duty to obey an order of the court.'"  (Id. at 10-11 (citing Contempt of United Stationers Supply Co., 239 Mich. App. 496, 501 (2000).)

Notwithstanding its explanation of the applicable legal standard, the state court's Contempt Opinion is replete with factual findings that the Debtor was aware of the Injunctive Order and knowingly undertook the sale of MSG's assets in violation of its terms.  For example, the court found that "Attorney Charron and Judd Schnoor were acutely aware that the sale of MSG's assets violated the court order of August 22, 2008." (Id. at 6.)  The court further found "as a fact that they understood that the sale of MSG's assets . . .  in November 2008 violated that court order."  (Id. at 8.)  As support for these findings, the court cited an October 14, 2008, email authored by the Debtor, which contained a "detailed explanation of the difficulties caused by the existing [Injunctive Order]."  (Id. at 6.)  The email acknowledges that the Injunctive Order requires court approval prior to any transfer of MSG's assets outside of the ordinary course of business. (Id. at 7.)  Given this restriction, the Debtor's email suggests that there are two options: either file a motion to obtain court approval of the transfer or transfer the assets without

court approval, and argue afterwards that the transfer was made "in the ordinary course."

(Id.)  The court found that this email "[spoke] volumes about Attorney Charron's view of

the propriety of his firm's sale" of the MSG assets.  (Id.)

Describing the Debtor's actions as the "most vexing aspect" of its contempt

analysis and discussing the Debtor's personal liability for violations of the prior court

order, the state court made the following findings of fact and conclusions of law:

> Michigan law plainly establishes that attorneys can be held in contempt of
> court both for their actions on behalf of their clients, e.g., Schumacher v
> Tidswell, 138 Mich. App. 708, 715-716, 722 (1984), and for their interactions
> with their clients.  E.g., Schoensee v Bennett, 228 Mich. App. 305, 317
> (1998).  Moreover, MCR 3.310(C)(4) makes clear that an injunctive order –
> such as the Court's order of August 22, 2008, prohibiting transfers of MSG's
> assets "outside the ordinary course of business" – binds parties and their
> attorneys alike.  Finally, the transcript of the 2008 contempt hearing reveals
> that Attorney Charron directly and actively participated in discussing the
> terms of the injunctive order . . . , so Attorney Charron cannot disclaim
> knowledge of the order.  In fact, his internal email traffic confirms that he
> was well aware of the continuing force of the Court's injunctive decree . . . .

(Id. at 15.)

Based on the Debtor's knowledge of the court's order, and his failure to abide by

it, the court concluded:

> In simple terms, the record reveals a textbook example of contempt of court
> by Attorney Charron, who *recognized that a court order prohibited all
> transfers of MSG's assets outside the ordinary course of business, yet took
> actions on behalf of his client (MSG) and his own law firm that did precisely
> what the court order forbade.*  That is, Attorney Charron siphoned all of the
> assets of MSG through his law firm and passed them on to NYPIA.  *These
> forbidden acts, when coupled with Attorney Charron's recognition of the
> impropriety of his conduct,* compel the Court to find, by clear and convincing
> evidence, that Attorney Charron acted in contempt of the court order
> entered on August 22, 2008.

(Id. at 15-16 (internal citations to the state court record omitted and emphasis added).)

The court also imputed Attorney Charron's knowledge of the Injunctive Order and violations thereof to his law firm, C&H. (Id. at 17.) In so doing, the court reiterated its prior holdings that the Debtor "actively participated in discussing the terms" of the Injunctive Order, and "fully understood" its requirements. (Id.) Despite this knowledge, Attorney Charron "knowingly took part in activities that violated" the order. (Id.)

The court determined that the appropriate sanction for C&H's contempt was to order the law firm to compensate the Plaintiff for one-half of the value of the assets that were seized and transferred in contravention of the Injunctive Order. (Id. at 18.) By contrast, the court determined that the sanction for Attorney Charron's contempt would be a "compensatory award of attorney fees, other costs, or both" for the amounts incurred by Morris in the contempt proceedings. (Id. at 16, 21 (citing Mich. Comp. Laws § 600.1721).) After a five-day evidentiary hearing on damages, the court determined that Morris had incurred $349,416.00 in attorney fees and $14,090.77 in costs during the contempt proceedings. The court entered an Opinion and Order Awarding Attorney Fees to Plaintiff Glenn S. Morris and Against Attorney David W. Charron and a Final Judgment, for this total amount, $363,506.77.[5] (Exhs. A and C, referred to collectively with the Contempt Opinion as the "Contempt Award.")

After the Circuit Court denied the Debtor's motion for reconsideration and motion for a new trial, the Debtor appealed the Contempt Opinion to the Michigan Court of Appeals. (See Exhs. D and E.) On appeal, the Debtor challenged the trial court's

---

[5]    The final judgment entered by the state court provides that the total amount of this award, is to be "credited and partially offset by a January 28, 2014 award of attorneys' fees and costs" against Morris and in favor of the Debtor in Kent County Circuit Court Case No. 09-01878-CB. (Exh. A.) The Plaintiff's complaint states that the amount of the offset is $22,443.77, making the net amount of the contempt award $341,063.00. (See AP Dkt. No. 1 at ¶ 7, 9.)

contempt ruling on several grounds, each of which were rejected by the Court of Appeals

in a lengthy written opinion issued on May 29, 2014.  The Court of Appeals found no merit

in the Debtor's arguments regarding the "infirmity" of the Injunctive Order, including his

"challenge to the court's authority" to hold him, as a non-party, in contempt of court.  (Exh.

H at 7.)  The court also deemed the Debtor's arguments about the validity of C&H's

security interest to be a "red herring" raised to distract from the real issue, which was that

the sale of MSG's assets occurred in violation of the Injunctive Order.  (Id. at 8.)

With regard to the Debtor's assertion that the Injunctive Order applied only to

Schnoor, and not specifically to Attorney Charron, the Court of Appeals held that:

> There exists no reasonable contention, given the status of Charron and
> Charron & Hanisch as the attorneys for both Schnoor and MSG throughout
> the underlying litigation and at all times relevant to the issuance of the
> injunctive order of August 22, 2008, that they would not be bound by the
> restrictions contained within that order.
> . . . .
> The record demonstrates that both Charron and Schnoor were present in
> the trial court when imposition of the injunction was discussed, and that both
> Charron and Schnoor acknowledged under oath an awareness of the
> injunctive proscriptions, with Charron acknowledging specifically that as of
> Octover 14, 2008, he was aware and had notice of the trial court's written
> order and its legitimacy.
> . . . .
> The existence of the injunctive order, the acknowledged awareness of the
> order's content, and the binding effect of the order on Schnoor and Charron,
> by name and by professional relationship, rendered it necessary to receive
> "authorization from the Court," before effectuating the November 2008
> asset sale.

(Id. at 7-9.)  The court further agreed with the trial court's conclusion that the Debtor's

October 14, 2008, email "belie[d] his contention . . . that he respected the [Injunctive

Order]."  (Id. at 9.)  The court noted that, in the email, "[Attorney] Charron clearly

recognizes an obligation to inform the trial court of a transfer."  (Id.)  The court held that

the email indicated the Debtor's knowledge of the Injunctive Order, as well as his

"understanding of the necessity for court approval of any action to be taken regarding MSG's assets." (Id. at 9-10.)

The appellate court also rejected Attorney Charron's assertion that the injunction was originally intended to be of a shorter duration than what was ultimately ordered by the trial court. (Id. at 10.)  The court held that, even if this assertion was true, Attorney Charron had notice of the trial court's written order and its lack of any time restrictions, as of mid-October 2008. (Id.)  For these, and numerous other reasons set forth in the written opinion, the Michigan Court of Appeals affirmed the trial court's contempt order.[6]

On December 31, 2014, the Debtor filed a voluntary chapter 7 petition.  The Plaintiff filed this nondischargeable debt adversary proceeding on April 10, 2015.  After holding a hearing on the parties' cross motions for summary judgment on July 8, 2015, this court took the motions under advisement.

## IV.    DISCUSSION.

### A.  *Summary Judgment Standard*.

Federal Rule of Civil Procedure 56(a), made applicable to this adversary proceeding by Federal Rule of Bankruptcy Procedure 7056, governs motions for summary judgment.  The Rule provides that "[a] party may move for summary judgment,

---

[6]      In his motion for summary judgment and reply to the Plaintiff's motion, the Debtor states that a second appeal, regarding the amount of the contempt award, was filed with the Michigan Court of Appeals in December 2013, and was stayed by the filing of the Debtor's bankruptcy case. (See AP Dkt. No. 4 at n. 6; AP Dkt. No. 13 at 12-13.)  The Debtor's pleadings also indicate that he plans to continue the appeal "for the purpose of reducing the amount of the Award" if this adversary proceeding is not dismissed.  (AP Dkt. No. 13 at 13.)
        When the court inquired about the appeal at oral argument, the parties were unsure of its status.  (See Transcript of Hearing on Cross Motions for Summary Judgment, AP Dkt. No. 14 at 6) (herein "Tr. at __.")  However, accepting the Debtor's statements as true, the fact that the amount of the contempt award may be subject to further appeal does not affect the finality of the state court's liability determination and is not material to this court's analysis of the dischargeability of the debt.  Counsel for the Debtor acknowledged at oral argument that the contempt award is a "final judgment as to that obligation."  (See Tr. at 3.)

identifying each claim or defense – or the part of each claim or defense – on which summary judgment is sought" and that the "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

In deciding a motion for summary judgment, the court is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50, 106 S. Ct. 2505, 2511 (1986) (the summary judgment analysis is a "threshold inquiry of determining whether there is the need for a trial – whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party").  All facts and related inferences are to be viewed in the light most favorable to the non-moving party.  Anderson, 477 U.S. at 255, 106 S. Ct. at 2513.  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'"  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 1356 (1986) (citation omitted).

Further, when a court reviews cross-motions for summary judgment, it "must evaluate each motion on its own merits and view all facts and inferences in the light most favorable to the nonmoving party."  Wiley v. United States (In re Wiley), 20 F.3d 222, 224 (6th Cir. 1994).  Denial of one party's motion for summary judgment does not automatically compel the conclusion that the other party is entitled to summary judgment. B.F. Goodrich Co. v. United States Filter Corp., 245 F.3d 587, 593 (6th Cir. 2001).

B.  _Section 523(a)(6) and the Preclusive Effect of the State Court Contempt Award._

The Plaintiff's complaint in this adversary proceeding alleges that the debt resulting from the state court Contempt Award is nondischargeable in the Debtor's chapter 7 case under § 523(a)(6).   In his cross motion for summary judgment, the Plaintiff further alleges that the elements of its nondischargeable debt claim are established by the factual findings in the Contempt Award, which he argues are entitled to collateral estoppel effect in this adversary proceeding.   Before addressing the specific arguments raised by the Debtor in response to these assertions and in support of his respective motion for summary judgment, the court will briefly analyze the standards for determining dischargeability under § 523(a)(6) and will consider the issue preclusive effect of the state court Contempt Award.

1.   Willful and Malicious Injury under § 523(a)(6) and Contempt Sanctions.

Section 523(a)(6) excepts from discharge debts "for willful and malicious injury by the debtor to another entity or to the property of another entity."   11 U.S.C. § 523(a)(6).   To except a debt from discharge under this subsection, the Plaintiff must show that he suffered a loss or injury as a result of willful and malicious conduct of the debtor.   See Steier v. Best (In re Best), 109 F. App'x 1, 5 (6th Cir. June 30, 2004) (unpublished opinion) (quoting In re Finch, 289 B.R. 638 644 (Bankr. S.D. Ohio 2003)) (additional citations omitted).   The "injury must invade the creditors' legal rights."   Id. at 6 (explaining that "the word 'injury' usually connotes legal injury (_injuria_) in the technical sense, not simply harm to a person") (quoting In re Geiger, 113 F.3d 848, 852 (8th Cir. 1997), aff'd, 523 U.S. 57, 118 S. Ct. 974 (1998)); see National Sign & Signal v. Livingston, 422 B.R. 645, 653 (W.D.

Mich. 2009) ("An 'injury' is '[t]he violation of another's legal right, for which the law provides a remedy; a wrong or injustice.'") (citation omitted).

Willfulness under § 523(a)(6) requires "a deliberate or intentional *injury*, not merely a deliberate or intentional *act* that leads to injury." Kawaauhau v. Geiger, 523 U.S. 57, 61, 118 S. Ct. 974, 977 (1998) (emphasis in original).  Thus, a willful injury is one where the debtor "'desires to cause [the] consequences of his act, or . . . *believes that the consequences are substantially certain to result from it.*'" Markowitz v. Campbell (In re Markowitz), 190 F.3d 455, 464 (6th Cir. 1999) (quoting Restatement (Second) of Torts § 8A, at 15 (1964)) (emphasis added); see Kawaahau, 523 U.S. at 61, 118 S. Ct. at 977 (noting that this "formulation triggers in the lawyer's mind the category 'intentional torts,' as distinguished from negligent or reckless torts").  An injury is "malicious" under § 523(a)(6) when a debtor acts "in conscious disregard of [his] duties or without just cause or excuse; it does not require ill-will or specific intent to do harm." Wheeler v. Laudani, 783 F.2d 610, 615 (6th Cir. 1986); Monsanto Co. v. Trantham (In re Trantham), 304 B.R. 298, 308 (6th Cir. B.A.P. 2004).  The statute requires that the alleged injury be both willful and malicious for the debt to be nondischargeable. In re Markowitz, 190 F.3d at 463. The Plaintiff bears the burden of establishing each element of his nondischargeable debt cause of action by a preponderance of the evidence. Grogan v. Garner, 498 U.S. 279, 291, 111 S. Ct. 654, 661 (1991).

The Sixth Circuit Court of Appeals has suggested a non-exclusive list of the types of misconduct that satisfy the willful and malicious injury standard of § 523(a)(6).  That list includes debts arising out of:  "intentional infliction of emotional distress, malicious

prosecution, conversion, assault, false arrest, intentional libel, and deliberately vandalizing the creditor's premises." In re Best, 109 F. App'x at 5 & n.2 (citations omitted); National Sign & Signal, 422 B.R. at 658.  Although this list does not specifically include debts arising from contempt sanctions, other courts, including the Sixth Circuit, have almost "uniformly . . . held that a contempt penalty constitutes a nondischargeable willful-and-malicious injury under § 523(a)(6)." Musilli v. Droomers (In re Musilli), 379 F. App'x 494, 499 (6th Cir. June 3, 2010) (unpublished opinion) (citing Siemer v. Nangle (In re Nangle), 274 F.3d 481, 484 (8th Cir. 2001) and Williams v. Int'l Brotherhood of Elec. Workers Local 520 (In re Williams), 337 F.3d 504, 511-12 (5th Cir. 2003)).

In Musilli, the Sixth Circuit held that a debt resulting from a prepetition state court criminal contempt judgment against the debtor was nondischargeable under § 523(a)(6). The debtors in Musilli were shareholders in a law firm that received a fee of over $1 million in a suit against General Motors.  Droomers filed suit against the law firm, alleging that the firm owed him a fee of approximately $350,000 for referring the case, or alternatively, that he was owed fees under a theory of quantum meruit.  In the course of the litigation, the state court entered an order enjoining the law firm from transferring any firm assets until it placed the approximately $350,000 in escrow.  Droomers was ultimately unsuccessful on his referral fee claim but prevailed, in part, on his quantum meruit claim. The debtors were subsequently held in criminal contempt of court for "flagrantly violating" the escrow order.  In re Musilli, 379 F. App'x at 496.

Although the Sixth Circuit stopped short of holding that a "debt resulting from contempt is willful and malicious per se," it carefully examined the state court record and

concluded that the contempt sanctions constituted a debt arising from willful and malicious injury to Droomers. Id. at 498-99. The court explained that the "escrow order made clear that 'injury was substantially certain to occur' should [the debtors] violate it." Id. at 499. The court further noted that the debtors had failed to point to any facts in the record that would refute this finding. Although the state court gave the debtors "clear instructions" that the law firm was to "escrow funds sufficient to cover a judgment against it," the debtors "transferred all of the firm's assets away from the firm, including transferring a significant amount of money to themselves" in direct violation of the court order. The debtors "offered no legitimate justification that might explain why their actions were not willful and malicious." Id. Therefore, the Sixth Circuit affirmed the bankruptcy court's grant of summary judgment on Droomers' § 523(a)(6) claim. The Musilli court's application of the § 523(a)(6) standard to a prior state court contempt finding is instructive in this adversary proceeding.

The rationale for holding contempt sanctions nondischargeable under § 523(a)(6) has also been succinctly articulated by several courts outside of the Sixth Circuit:

> When a court of the United States . . . issues an injunction or other protective order telling a specific individual what actions will cross the line into injury to others, then damages resulting from an intentional violation of that order as is proven either in the Bankruptcy Court or, so long as there was a full and fair opportunity to litigate the questions of volition and violation, in the issuing court are *ipso facto* the result of a "willful and malicious injury."
>
> This is because what is "just" or "unjust" conduct as between the parties has been defined by the court . . . . An intentional violation of the order is necessarily without "just cause or excuse" and cannot be viewed as not having the intention to cause the very harm to the protected persons that order was designed to prevent.

Williams v. Int'l Brotherhood of Elec. Workers Local 520 (In re Williams), 337 F.3d 504, 512 (5th Cir. 2003) (quoting Buffalo Gyn Womenservices, Inc. v. Behn (In re Behn), 242 B.R. 229, 238 (Bankr. W.D.N.Y. 1999)).  This court agrees with the quoted rationale and holds that, to the extent the Contempt Award in this proceeding arose from the Debtor's willful and malicious violation of the Injunctive Order and caused injury to the Plaintiff, the Award is nondischargeable under § 523(a)(6).

> 2. Collateral Estoppel:  Is the State Court Contempt Opinion entitled to Preclusive Effect in this Adversary Proceeding?

The Plaintiff asserts that the "willful" and "malicious" nature of the state court Contempt Award is established by the factual findings of the state court, which he argues are entitled to collateral estoppel effect in this adversary proceeding.  The doctrine of collateral estoppel, or issue preclusion, applies in nondischargeability proceedings.  See Grogan v. Garner, 498 U.S. at 284-85 n.11, 111 S. Ct. at 656; McCurdie v. Strozewski (In re Strozewski), 458 B.R. 397, 403-04 (Bankr. W.D. Mich. 2011) (while the bankruptcy court must make its own determination regarding the dischargeability of a debt, that determination may be governed by factual issues which were decided in a prior proceeding).  Accordingly, collateral estoppel prevents an issue of fact or law from being relitigated in a nondischargeable debt proceeding, where the issue "was actually litigated and necessarily decided in a prior action between the same parties." Phillips v. Weissert (In re Phillips), 434 B.R. 475, 485 (6th Cir. B.A.P. 2010) (citing In re Markowitz, 190 F.3d at 461).

When determining the preclusive effect of a prior state court judgment, this bankruptcy court is required to give the prior judgment the same preclusive effect it would have in the state court, unless the Full Faith and Credit Statute, 28 U.S.C. § 1738,

provides an exception.  Hinchman v. Moore, 312 F.3d 198, 202 (6th Cir. 2002) (quoting

Migra v. Warren City School District Bd. of Educ., 465 U.S. 75, 81, 104 S. Ct. 892, 896

(1984)); In re Strozewski, 458 B.R. at 404 (also citing Migra) (additional citation omitted).

Here, the contempt order was entered by a Michigan court, so Michigan preclusion law

governs.

> Under Michigan law, issue preclusion applies when:
>
> (1)     there is identity of parties across the proceedings,
> (2)     there was a valid, final judgment in the first proceeding,
> (3)     the same issue was actually litigated and necessarily determined in
>          the first proceeding, and
> (4)     the party against whom the doctrine is asserted had a full and fair
>          opportunity to litigate the issue in the earlier proceeding.

Darrah v. City of Oak Park, 255 F.3d 301, 311 (6th Cir. 2001) (citing People v. Gates, 434

Mich. 146, 154, 452 N.W.2d 627, 630-31 (1990)).  Application of these requirements

furthers the purpose of collateral estoppel, which is "to strike a balance between the need

to eliminate repetitious and needless litigation and the interest in affording litigants a full

and fair adjudication of the issues involved in their claims."  Storey v. Meijer, Inc., 431

Mich. 368, 372-73, 429 N.W.2d 169, 171 (1988) (citations omitted).  When determining

whether issue preclusion applies, this court must "look beyond the pleadings to consider

both the 'factual focus' of the prior proceedings and 'whether the party against whom

collateral estoppel is asserted has had a full and fair opportunity to litigate the issue.'"

Livingston v. Transnation Title Insurance Co. (In re Livingston), 372 F. App'x 613, 617

(6th Cir. Apr. 9, 2010) (unpublished opinion) (citing Gates, 452 N.W.2d at 631).

There is no dispute that the parties to this adversary proceeding are the same

parties involved in the state court litigation and that the contempt sanctions were imposed

in a valid, final judgment.[7]  The key question is whether the facts necessary to establish "willful and malicious injury" under § 523(a)(6) were actually litigated and necessarily determined in the state court.

Michigan law considers an issue "actually litigated" if it is "put into issue by the pleadings, submitted to the trier of fact for determination, and is thereafter decided."  In re Phillips, 434 B.R. at 486 (citing Latimer v. William Mueller & Son, Inc., 149 Mich. App. 620, 640, 386 N.W.2d 618, 627 (1986)).  Under Michigan law, "[a]n issue is necessarily determined only if it is 'essential' to the judgment."  Gates, 452 N.W.2d at 631 (citing Restatement (Second) of Judgments § 27 cmt. h (1982)).  The "appropriate question is whether the issue was actually recognized by the parties as important and by the trier as necessary" to the prior judgment.  Restatement (Second) of Judgments § 27 at cmt. j.  If it was, the determination will most often be "conclusive between the parties in a subsequent action."  Id. (noting that this result is subject to the exceptions to the general rules of issues preclusion set forth in § 28 of the Restatement (Second)).

The issues regarding the Debtor's violation of the Injunctive Order were litigated thoroughly and extensively, both in the trial court and on appeal.  The Debtor actively participated in every aspect of the contempt litigation.  The trial court made extensive factual findings in a detailed written opinion that was carefully analyzed and affirmed on appeal.  The Debtor argues, however, that the factual issues that would establish the willful and malicious nature of the contempt sanctions were not "necessarily determined" by the state courts.  The Debtor bases this assertion on the differing standards of

---

[7]    The court recognizes that the amount of the contempt award may be subject to an additional appeal in the state court.  See note 6, supra.  This court's determination of the nondischargeable nature of the debt is without prejudice to the Debtor's right to request relief from stay, if necessary, and pursue his appeal regarding the amount of the award in the state court.

culpability that apply to state court civil contempt findings and determinations of nondischargeability under § 523(a)(6).

The Sixth Circuit recently addressed the question of whether collateral estoppel applies to a state court judgment in a nondischargeable debt action when state law imposes a different "mental-state standard" than is required under the Bankruptcy Code. See Nehasil v. Grenier (In re Grenier), 458 F. App'x 436 (6th Cir. Jan. 31, 2012) (unpublished opinion). The creditors in Grenier purchased a home from the debtors, only to discover soon after that the house had serious defects, including "water damage, rotting floors, insect infestation, faulty electrical wiring, and fake water fixtures," that had been concealed by the debtors. Id. at 438. The creditors sued the debtors for fraud in Michigan state court, and the jury returned a verdict awarding the creditors nearly $300,000 in damages. Id. After the debtors filed their bankruptcy case, the creditor sought to have this debt excepted from the debtors' discharge under § 523(a)(2)(A). The debtors argued that the state court jury verdict was not entitled to preclusive effect, because Michigan law permits a finding of fraud when false statements are made recklessly, whereas § 523(a)(2)(A) requires "at least gross recklessness." Id.

The Sixth Circuit held that the debtors' argument about the differing legal standards "might have some force" if all it "had to go on were the fact of the Greniers' liability for fraud."[8] Id. at 438. But, in this case, it "had more." Id. In finding the debtors liable for

---

[8]      In the absence of specific factual findings, some courts have refused to afford preclusive effect to state court judgments in subsequent nondischargeable debt actions, when the applicable state law imposes a lesser mental state standard than is required under § 523(a). See, e.g., Dantone v. Dantone (In re Dantone), 477 B.R. 28, 38-40 (6th Cir. B.A.P. 2012) (state court money judgment, which did not state basis for award, could be presumed to be for statutory conversion due to inclusion of punitive damages; however, allegations of fraud in complaint were not essential to the judgment because Michigan law does not require a finding of "circumstances indicating fraud" for statutory conversion).

fraud, "the Michigan jury made specific factual findings" including a finding that the debtors had actual knowledge about the defects in the home that they failed to disclose. Id. at 438-39.  The court gave preclusive effect to this factual finding and held that the debt was nondischargeable, notwithstanding the minor difference in the applicable legal standards.  Id. at 439; see also In re Livingston, 372 F. App'x at 619 (declining to decide whether the elements of fraud under Michigan law were "identical to the higher federal 'gross recklessness' standard for non-dischargeablity under § 523(a)(2)(A)" before affording preclusive effect to a state court judgment, because the factual findings of the state courts "conclusively establish[ed] fraud under the bankruptcy-law standard.")

Although Grenier involved fraud under § 523(a)(2)(A), its reasoning applies with equal force to the § 523(a)(6) claim at issue in this adversary proceeding.  In the prior state court litigation, both the trial court and the Michigan Court of Appeals acknowledged that civil contempt under Michigan law does not require "willful disobedience" of a court order, but only requires the court to find that the actor "was neglectful or violated its duty to obey an order of the court."   See Exh. B at 10; Exh. H at 7.  Under this standard, the state courts theoretically could have held the Debtor in contempt without finding the "willful" disobedience of the Injunctive Order required under § 523(a)(6).  But that is not what occurred.  Instead, having noted the potentially lower standard of culpability, the state courts went on to make detailed factual findings regarding the Debtor's knowledge of the existence, terms, and duration of the Injunctive Order.  Describing the Debtor's behavior as a "textbook example of contempt of court" the trial court held that the Debtor, "who recognized that a court order prohibited all transfers of MSG's assets" proceeded to take actions that "did precisely what the court forbade."   See Exh. B at 15-16.  Citing

transcripts of prior court proceedings, and an email authored by the Debtor himself, the trial court held that the Debtor was an active participant in discussing the terms of the Injunctive Order, and was "well aware" of its continuing force.  Despite this awareness, the Debtor knowingly participated in the sale of MSG's assets in direct violation of the Injunctive Order.  These specific factual findings were not gratuitous comments or dicta, but rather were essential elements of the trial court's analysis and opinion.  The significance of these findings, and their centrality to the factual focus of the state courts, is further evidenced by the fact that they were appealed by the Debtor and affirmed by the Michigan Court of Appeals.  The appellate court's opinion specifically rejected the Debtors arguments regarding the "infirmity" of the Injunctive Order and his lack of knowledge of the order and its duration.  Under the circumstances of this case, the detailed factual findings of the state courts were essential to the Contempt Award should be given preclusive effect in this adversary proceeding.

This court's conclusion that the factual findings made by the state court are entitled to preclusive effect in this adversary proceeding is not only consistent with Grenier and other relevant case law, but also effectuates the underlying purposes of collateral estoppel.  Like the findings in Grenier, and as discussed in greater detail below, the state court's factual findings in this case conclusively establish the nature of the Debtor's actions under § 523(a)(6).  To relitigate those issues in this court would result in precisely the type of repetitious litigation, waste of resources, and potential for inconsistent judgments that the doctrine of collateral estoppel is designed to prevent.  See Monat v. State Farm Ins. Co., 469 Mich. 679, 692-93, 677 N.W.2d 843, 851 (2004) (under Michigan law, the doctrine of collateral estoppel acts "to relieve parties of the cost and vexation of

multiple lawsuits, conserve judicial resources, and, by preventing inconsistent decisions, encourage reliance on adjudication . . . ."); see also Parklane Hoisery Co. v. Shore, 439 U.S. 322, 336 n.23, 99 S. Ct. 645, 654 (1979) ("[T]he whole premise of collateral estoppel is that once an issue has been resolved in a prior proceeding, there is no further factfinding function to be performed.").

   3.   Do the State Court's Factual Findings Establish the "Willful" and "Malicious"
        Nature of the Contempt Award?

The state courts' specific factual findings regarding the Debtor's knowing violation of the Injunctive Order establish that the Debtor's actions were willful for purposes of § 523(a)(6).  The trial court's factual findings, which were affirmed by the Michigan Court of Appeals, conclusively establish that the Debtor knew about the Injunctive Order, and understood its terms.  The Injunctive Order identified the precise conduct – transfer of MSG's assets – that was "substantially certain" to result in injury to the Plaintiff.  Despite the Debtor's knowledge of the Injunctive Order and its terms, he intentionally undertook conduct that "did precisely what the court order forbade."  See Exh. B at 15.  Under these circumstances, this court finds that the Debtor's contemptuous conduct was "willful."

Despite the Debtor's assertions to the contrary, the factual findings made by the state courts in connection with the Contempt Award also establish the "malicious" nature of the Debtor's actions.  In his response to the Plaintiff's motion for summary judgment the Debtor raises seven bases on which he asserts this court should hold his violations of the Injunctive Order were undertaken with "just cause or excuse":

   (1) the unusual formation of the injunction; (2) the fact C&H was owed
   $398,359.91 at the time of the Article 9 sale; (3) C&H held a valid security
   interest; (4) the Plaintiffs were not creditors of MSG; (5) Schnoor was the
   only named restrained party; (6) the Injunction was stipulated to be in effect
   for two weeks but it lasted indefinitely; (6) no one informed C&H or the

> Debtor that they were restrained by the Injunction; and (7) C&H believed
> Morris' security interest in the stock was worthless due to the actions of the
> Plaintiffs . . . .

<u>See</u> AP Dkt. No. 13 at 22.  These arguments were raised – and conclusively rejected –

in the prior state court litigation.  The Michigan Court of Appeals deemed the Debtor's

arguments regarding the validity of C&H's security interest a "red herring," and rejected

his assertions regarding the "infirmities" of the Injunctive Order.  The appellate court also

affirmed the trial court's findings that the Debtor knew about the Injunctive Order, knew it

applied to him, understood its duration and recognized that it remained in effect at the

time the MSG stock were transferred.  In light of these factual findings, no plausible

argument can be made that the Debtor violated the Injunctive Order with "just cause or

excuse."  The state court findings establish that the Debtor knowingly and consciously

disregarded his duties under the Injunctive Order.  Therefore, his actions were malicious

under § 523(a)(6).

    4.  <u>The Defendant's Motion for Summary Judgment:  Is the Contempt Award a
Debt for Injury to the Plaintiff or the Plaintiff's Property?</u>

Finally, the court will address the Debtor's argument that regardless of the willful

and malicious nature of the Debtor's conduct, the Contempt Award does not constitute a

debt for "injury" to the Plaintiff or his property, which is a threshold requirement of

§ 523(a)(6).  The Debtor argues that the contempt damages imposed against him

personally were awarded to compensate the Plaintiff for costs incurred in conjunction with

the contempt proceedings.  He points out that the Plaintiff sued other parties – including

C&H – for fraud, conversion, and other intentional torts in connection with the transfer of

the MSG stock.  Even in the context of the contempt proceedings, it was C&H, and not

the Debtor, that was held responsible for the Plaintiff's loss of its one-half interest in the

MSG stock.  According to the Debtor, the state court emphasized this point when it stated in its opinion that the Contempt Award did not involve "damages for personal injury, property damage, or wrongful death" and refused to allocate the award between responsible parties under Mich. Comp. Laws § 600.2957(1).  See Exh. D at 2-3; Exh. E at 4.

However, the fact that the Debtor was not held liable for the underlying fraudulent transfer or that other parties were ordered to compensate the Plaintiff for the lost stock value he suffered as a result of the transfer does not compel the conclusion that the Plaintiff suffered no injury as a result of the Debtor's contempt.  Again, the state court's Injunctive Order specifically identified a prohibited action – i.e., transfer of MSG's assets – that would "cross the line into injury" to the Plaintiff.  In re Williams, 337 F.3d at 512 (quoting In re Behn, 242 B.R. at 238); see In re Best, 109 F. App'x at 5 (for purposes of § 523(a)(6), an "injury" is an "invasion of the creditor's legal rights").  Upon finding that the Debtor knowingly crossed this line and acted in contempt of the Injunctive Order, the state court imposed sanctions pursuant to Mich. Comp. Laws § 600.1721.  That section provides that when "alleged misconduct has caused an actual loss or injury to any person the court shall order the defendant to pay such person a sufficient sum to indemnify him, in addition to the other penalties which are imposed upon the defendant."  Id.  These attorney's fees and costs were awarded to the Plaintiff as a result of the Debtor's knowing violation of the Injunctive Order and were imposed to compensate the Plaintiff for the injuries he suffered as a direct result of the Debtor's willful and malicious actions.

Other courts that have addressed the issue of whether prepetition contempt awards are compensation for "injury" to the plaintiff when there is no underlying judgment

debt and the award is only for statutory fees and costs have reached this same result.

See, e.g., In re Musilli, 398 B.R. 447, 455-56 (E.D. Mich. 2008), aff'd, 379 F. App'x 494 (6th Cir. 2010) (rejecting debtors' arguments regarding the creditors' lack of an interest in property subject to state court escrow order and "injury" thereto; even though creditor obtained escrow order by asserting rights under the Michigan UFTA, damages imposed against debtors for violation of that order arose from their contempt and not under the UFTA); Suarez v. Barrett (In re Suarez), 400 B.R. 732 (9th Cir. B.A.P. 2009).  In Suarez, the Ninth Circuit B.A.P. held that an award of attorney's fees and costs for contempt of a state court injunction was the proximate result of the debtor's willful and malicious violation of the injunction, notwithstanding the fact that the contempt award did not include a compensatory component.  The court noted that, when faced with the debtor's violation of a state court injunction:

> [The creditor] had two choices:  to suffer in silence, or pursue enforcement of the outstanding order.  Neither the law nor basic fairness require the former; the latter was a natural consequence of [the debtor's] contemptuous behavior.  In electing to pursue her remedies, [the creditor] was substantially certain to incur fees and costs, and the monetary sanction imposed was to compensate her for those fees and costs.

In re Suarez, 400 B.R. at 740 (citing Cohen v. de la Cruz, 523 U.S. 213, 118 S. Ct. 1212 (1998) (the phrase "any debt for" in § 523(a) includes all debts and liability arising from the specified conduct)) (additional citations omitted).  Like the attorney's fees and costs in Suarez, the Contempt Award in this adversary proceeding was imposed to compensate the Plaintiff for injuries he suffered as a result of the Debtor's willful and malicious violation of the Injunctive Order.  Accordingly, the Contempt Award is nondischargeable under § 523(a)(6).

IV.   <u>CONCLUSION</u>.

The Contempt Award in this case was based on the state courts' findings that the Debtor knowingly and intentionally transferred MSG's assets in violation of the Injunctive Order and that the Plaintiff incurred damages as a direct result of the Debtor's actions. Those factual findings also establish that the Debtor's actions were "willful" and "malicious" under § 523(a)(6).  The Injunctive Order prohibited conduct that would, by definition, cause injury to the Plaintiff.  By knowingly violating the Injunctive Order, the Debtor acted "willfully" because he either intended to cause injury to the Plaintiff, or could be substantially certain that injury would result.  The Debtor also acted "maliciously" because his violation of the Injunctive Order was in conscious disregard of his duties to comply with the order.  The damages awarded to the Plaintiff were a result of the Defendant's willful, malicious, and contemptuous actions.

For these reasons, the Plaintiff is entitled to judgment as a matter of law under § 523(a)(6) and his cross motion for summary judgment shall be granted.  The Defendant's motion for summary judgment shall be denied.  A separate order shall be entered accordingly.

**IT IS SO ORDERED.**

**Dated September 30, 2015**





James W. Boyd
United States Bankruptcy Judge