## UNITED STATES BANKRUPTCY COURT
## WESTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| In re: | Case No. 14-07970 |
| DAVID W. CHARRON | Chapter 7 |
| Debtor. | Honorable James W. Boyd |

| | |
|---|---|
| GLENN S. MORRIS and THE GLENN S. MORRIS TRUST, | Adversary Proceeding No. 15-80086-JWB |
| Plaintiffs, | |
| v | |
| DAVID W. CHARRON, | |
| Defendant. | |

Ronald J. Spinner (P73198)
Eric D. Carlson (P60277)
Stanley J. Stek (P29332)
Miller, Canfield, Paddock and Stone, PLC
Attorneys for Plaintiffs Glenn S. Morris and
The Glenn S Morris Trust
150 West Jefferson, Suite 2500
Detroit, MI  48226
(313) 496-7829

Perry G. Pastula ( P35588)
Dunn, Schouten & Snoap, PC
Attorneys for Debtor David W. Charron
2745 DeHoop Ave SW
Wyoming, MI  49509
(616) 538-6380

## DEFENDANT/DEBTOR DAVID W. CHARRON'S MOTION TO AMEND THE COURT'S FINDINGS UNDER RULE 52 AND AMEND JUDGMENT UNDER RULE 59

David W. Charron (the "Debtor"), by and through his counsel, Dunn, Schouten & Snoap, P.C., hereby moves this Court to amend and add findings to its *Opinion Denying Defendant's Motion for Summary Judgment and Granting Plaintiff's Cross Motion for Summary Judgment* dated September 30, 2015 ("Judgment") pursuant to Federal Rule of Civil Procedure 52, as made

1

applicable to the Bankruptcy Courts by B.R. 7052, and to amend the Judgment to more precisely reflect the record reviewed by this Court pursuant to Federal Rule of Civil Procedure 59, as made applicable to the Bankruptcy Courts by B.R. 9023.

<u>ADDITIONAL FACT FINDINGS - B. R. 7052</u>

The Debtor requests that this Court make the following additional fact findings for the purpose of assisting any future appellate review, and more fully depicting the facts of the case on the key issues of the case, including the Debtor's "knowledge", "malice" and the alleged injury to Plaintiff Glenn S. Morris and the Glenn S. Morris Trust (collectively the "<u>Plaintiff</u>"):

1.    The Court did not review the entire record of the state court proceedings. The Debtor submitted selected transcript excerpts from various hearings which he deemed relevant to oppose the Plaintiff's Cross Motion for Summary Judgment.

2.    In May of 2008, the law firm of Charron & Hanisch, PLC ("<u>C&H</u>" or the "<u>law firm</u>") obtained and perfected a security interest in the assets of Morris, Schnoor & Gremel, Inc. ("<u>MSG</u>" or the "<u>corporation</u>"), to secure the repayment of attorney fees.[1] The lien secured fees of $286,230.95 which were presently due, as well as future fees of the law firm.[2]

3.    The Plaintiff held no interest in the assets of MSG at the time the security interest

_____

[1] *See* Exhibit B to Debtor's Motion for Summary Disposition, Opinion and Order Setting Forth Findings of Civil Contempt dated 12/27/12, Kent County Circuit Court Case No. 07-06441-CR, p. 7-8, 18, AP Dkt. No. 4 ("<u>Contempt Opinion and Order</u>"); Complaint Objecting to Discharge of the Debtor, ¶ 21.

[2] Contempt Opinion and Order, p 3; Exhibit 14 to Debtor's Reply to Counter Motion for Summary Judgment AP Dkt. No. 13-1 ("<u>RCMSJ</u>").

-2-

was granted to C&H.[3]   The Plaintiff did not own the MSG assets or have them under contract to purchase.  The Plaintiff did not have a lien against the MSG assets.  The Plaintiff was not a creditor of MSG.  The Plaintiff was not a shareholder of MSG.

4.      C&H was a secured creditor of MSG. C&H's lien was subordinate to the security interest of a senior secured creditor, Fifth Third Bank (the "Bank").  The Bank's lien secured a $400,000 line of credit which became due in full in January of 2009.[4]

5.      C&H conducted an Article 9 sale of MSG Assets on November 21, 2008 to liquidate a $398,359.91 debt owed to C&H by MSG which was delinquent.[5]

6.       C&H received $395,000 from the sale. The purchaser of MSG assets also paid off the senior Bank debt in full.[6]

7.      The State Trial Court's Opinion does not make any factual findings on whether the Debtor acted maliciously towards the Plaintiff or his property, as "malice" was not a required element of contempt.[7]

8.      To oppose the Plaintiff's Cross Motion for Summary Judgment, the Debtor testified by affidavit that: (1) he never intentionally or maliciously targeted the Plaintiff for the purpose of causing him or his property injury; and (2) he did not, in fact, believe

---

[3] Contempt Opinion and Order, p. 3; RCMSJ, p. 4.

[4] Affidavit of David W. Charron, Exhibit A to RCMSJ, ¶3 ("Charron Affidavit"); Exhibit 27 to RCMSJ, Hrg tr. 2/9/09.

[5] Charron Affidavit ¶3; Contempt Opinion and Order, p. 6; Complaint  ¶ 49.

[6] Charron Affidavit, ¶2 and 3; RCMSJ, p. 4.

[7] Contempt Opinion and Order; RCMSJ, p. 11

the Article 9 sale would or did cause Plaintiff or his property injury because the MSG

stock the Plaintiff held as collateral was worthless before the sale was conducted.[8]

9.     The Debtor testified that he believed the MSG stock was worthless because: (1) the

debts of the corporation approached $2.8 million dollars at the time of the Article 9

sale, and exceeded any reasonable estimate of the value of the corporation's assets;

(2) creditors are paid first before shareholders have any right to a distributions from

the corporation; and (3) MSG's assets consisted of a declining number of insurance

accounts which were not protected by non-competition or non-solicitation

agreements.[9] Insurance agents who maintained the accounts, so-called "producers"

(as well as any other employee), could leave MSG with the accounts and without any

consequences. Plaintiff also had successfully relocated accounts representing forty

percent (40%) of MSG's client income to his new insurance agency before the

Article 9 sale occurred.[10]  MSG received nothing when its clients departed.

10.    As further support that the Debtor's acted free from malice, the Debtor also testified

that C&H did not conduct an Article 9 sale until: (1) all settlement negotiations with

Plaintiff stopped; (2) Plaintiff's attorney threatened not to pay MSG's debt to C&H

if his client purchased the assets of MSG following any bankruptcy filing by R. Judd

---

[8] Charron Affidavit, ¶ 2 and 3; RCMSJ, p.2-3; Exhibit 9 to RCMSJ.

[9]Exhibits 9 and 18 to RCMSJ

[10] Charron Affidavit, ¶2 and 3; Debtor's Reply to CMSJ, p. 4.  The State Trial Court
characterized the situation as follows: "Mr. Morris achieved extraordinary success in obtaining
clients upon his departure from MSG."  Michigan Court of Appeals Opinion, p. 54, Exhibit H to
Debtor's Motion for Summary Judgment, AP Dkt. No. 4 ("COA Opinion").

Schnoor's ("Schnoor"); (3) world capital markets collapsed; (4) world credit markets froze; (5) the law firm had exhausted its lines of credit to carry the MSG litigation; and (6) less than two months remained before MSG's senior Bank debt ballooned, thereby allowing the Bank to extinguish the lien of C&H.[11]

11.    Schnoor was the only party restrained by name in the Injunctive Order.[12]   The Injunctive Order arose when Schnoor stopped making payments to Plaintiff on a promissory note he had given to Plaintiff for his stock interest in MSG.[13]

12.    The Injunctive Order did not arise as the result of any complaint about the conduct of the Debtor or his law firm.[14]

13.    The State Trial Court made no findings of fact and gave no reasoning for the issuance of the Injunctive Order when the restraint arose, or in the text of the Injunctive Order.[15]

14.    The duration of the Injunctive Order was stipulated by Schnoor and Plaintiff to be "a week or two" but, for reasons never enumerated to the parties on the record or in an opinion or order, the State Trial Court issued the Injunctive Order with a perpetual

---

[11]Charron Affidavit, ¶2 and 3; RCMSJ, p. 11

[12]Charron Affidavit, ¶2; RCMSJ, p.3-6

[13]Contempt Opinion and Order

[14]Charron Affidavit, ¶2; RCMSJ, p.5-6; Exhibit 21 to RCMSJ, Hrg Tr 8/20/2009.

[15] Contempt Opinion and Order; Exhibit 21 to RCMSJ, Hrg Tr 8/20/2009; Exhibit 1 to RCMSJ, ¶2 and 3; Injunctive Order.

duration.[16]

15.    At no point in time prior to the Article 9 sale of assets did the State trial court

instruct, warn or notify C&H or the Debtor that they were restrained by the Injunctive

Order.[17]

16.    The State Trial Court does not identify when it believes the Debtor first became

aware that the Injunctive Order was applicable to the Debtor and his law firm, nor the

basis for its conclusion that the Debtor knew the Injunctive Order applied to all

transfers of MSG assets and not merely transfers of MSG assets by Schnoor. [18]

17.    The Debtor disclosed to the State Trial Court all material terms of the Article 9 sale

documents shortly after the sale.[19]   At the February 9, 2009 hearing, the Debtor

testified that the law firm notified MSG that it was withdrawing from the case and

conducting the Article 9 sale because MSG was not making any payments on its

account; the law firm could no longer carry the costs of the corporation's litigation;

the firm had exhausted its credit lines to support the claims; the law firm's other

clients were also not paying C&H on a timely basis due to the world economic crisis;

and C&H was strapped for cash and facing employee layoffs.   The Debtor testified

that the law firm's junior lien would be extinguished by any Article 9 sale of the

senior secured debt.   The Debtor furnished the State Trial Court with a letter from

---

[16]Injunctive Order; Exhibit 21 to RCMSJ, Hrg Tr 8/20/2009.

[17]Charron Affidavit, ¶2 and 3; RCMSJ, p.9-11

[18]Contempt Opinion and Order

[19]Exhibit 27 to RCMSJ, Hrg Tr 2/9/2009.

C&H to MSG which suggested the possibility of a private Article 9 sale by the law firm and the possible benefits of having the law firm sell the collateral to a friendly buyer who desired to preserve the current management team.   C&H encouraged MSG to notify it of anyone who might be interested in purchasing the assets of MSG. The Debtor testified that MSG gave a copy of C&H's letter to its certified public accountant.  The accountant gave the letter to one of its clients, William Woodworth, and Mr. Woodworth contacted the Debtor to express interest in an asset purchase. Woodworth formed New York Private Insurance Agency and struck a deal for the purchase of collateral.   The State Trial Court did not raise issue with any of the Debtor's testimony, including the sale or the communications with Schnoor and MSG. Plaintiffs did not raise any objections to the sale.  No one asserted that the Debtor or C&H acted in contempt of State Trial Court at the hearing.

18.     Plaintiff obtained a show cause order for contempt from the State Trial Court on May 19, 2011, more than two years after the Article 9 sale occurred. [20]

19.     C&H and the Debtor asserted that the Article 9 sale was exempted from the Injunctive Order because the law firm's debt and security interest preceded the Injunctive Order, thereby making the repayment of the debt and the rights and obligations of the security interest the ordinary course of MSG's business.[21]   The Debtor testified that he never believed that either he or C&H were subject to the Injunctive Order because C&H derived its rights from a non-restrained party, MSG,

---

[20]Contempt Opinion and Order, p. 1

[21]Exhibit 27 to RCMSJ, Hr Tr 2/9/09;  COA Opinion, p. 11-13

and C&H acted on its own behalf, pursuant to the pre-existing rights that the law firm held as a secured creditor. The Michigan State Courts disagreed.[22]

20.    Schnoor was never tried for violating the Injunctive Order and consequently, never found in contempt of the Injunctive Order.[23]

21.    At the time of the Article 9 sale, Plaintiff still did not own any portion of the MSG assets, nor have them under contract to purchase. Plaintiff did not have a lien against the MSG assets. Plaintiff was not a creditor of MSG. Plaintiff was not a shareholder of MSG.[24]

22.    The State Trial Court considered MSG stock worthless after the Article 9 sale. The State Trial Court never determined the value of MSG stock before the sale.[25] The State Trial Court awarded compensation to the Plaintiff based upon the lost value of MSG assets.[26]

23.    The State Trial Court never identified the Debtor as the cause of the litigation it

---

[22]COA Opinion, p. 11-13

[23]Contempt Opinion and Order, Footnote 1: "Judd Schnoor filed for bankruptcy on January 28, 2009, see Plaintiff's Exhibit 447, and so Glenn Morris has conceded that Mr. Schnoor is shielded from civil liability in this matter."

[24]Contempt Opinion and Order

[25] Contempt Opinion and Order;  Charron Affidavit, ¶2 and 3; RCMSJ, p.11. This is because no proofs were offered at trial on this subject. The trial court makes numerous statements in its Opinion about the Plaintiff being left "high and dry" as a result of the asset sale but it never calculates "before" and "after" values associated with the MSG stock Plaintiff held as collateral. It simply awards Plaintiff one half of the pre-sale value of MSG assets.  There was also no mention or determination of MSG's liabilities in the Opinion.

[26]Contempt Opinion and Order, p. 13-14.

characterized as vexatious.    The Debtor withdrew from representing <u>Schnoor</u> and MSG in the Fall of 2008.  The litigation continued for four years after his departure.[27]

24.    Plaintiff filed a Complaint Objecting to Discharge of the Debtor on April 10, 2015 which alleged as the sole basis for its objection:

"93.    [The Plaintiffs'] security interest in MSG's stock constitutes a <u>property</u> interest.
94.    [The Debtor] thus willfully and maliciously caused injury to <u>[the Plaintiff's]</u> property.
****
96.    Because [the Debtor] willfully and maliciously caused injury to [the Plaintiffs'] <u>property</u>, [the Debtor] is not entitled to a discharge pursuant to 11 U.S.C. § 523(a)(6)." (*See* Complaint, p. 10-11)(Emphasis added).

25.    Plaintiff's Complaint did not allege that the Debtor caused personal injury to Plaintiff, or that the Award against the Debtor represented compensation for willful and malicious injury to Plaintiff's person.

26.    Plaintiff's Cross Motion for Summary Disposition sought relief under F. R. Civ P. 56(a) and B R 7056, and it was premised upon the allegations of its Complaint, and the absence of any genuine issue of fact.

27.    This Bankruptcy Court originated the idea that the Award represents compensation for willful and malicious injury to Plaintiff's person while drafting the Opinion which disposed of this action.  The Debtor was given no opportunity to respond to the claim the Bankruptcy Court created for the Plaintiff.

---

[27]<u>Contempt Opinion and Order</u>.

<u>AMENDED JUDGMENT - B.R. 9023</u>

The Debtor requests the court to make the following amendments to the Judgment in order to fully adjudicate claims, correct plain errors, and/or facilitate appellate review of the case:

1.      The Debtor requests that the Court correct the first sentence of paragraph two of the Facts and Procedural Background section so that it reads:

"The state court entered an order on August 22, 2008, stating:

"IT IS FURTHER ORDERED that Defendant R. Judd Schnoor shall not transfer the assets of Morris, Schnoor & Gremel, Inc., outside the ordinary course of business without authorization from the Court to do so. (<u>Id</u> at 4, sometimes referred to herein as the "Injunctive Order".)

This change is requested because the Injunctive Order *was not consistent* with the parties' agreement because the restraint was perpetual in duration, rather than limited to "a week or two" as stipulated.   This change is supported by the transcript of the August 20, 2008 hearing as well as the text of the Injunctive Order   (Exhibit B to AP Dkt. No. 4; ).   The significance of this difference is that for weeks following the August 20, 2008, the Debtor and his client acted under the reasonable belief that the requested Injunctive Order was going to expire and they considered possible options for <u>Schnoor</u> to raise money to pay Plaintiff's note.[28]   The Injunctive Order never reflected a time limitation  nor an explanation why the "parties agreement" was not respected.

2.      The Debtor requests that this Court amend and replace the following sentence in paragraph two of the Facts and Procedural Background section of its Opinion which reads: "No party, including the Debtor, objected, and the state court granted that request", with the following:

"No party objected, and the state court granted that request."

_____

[28]Exhibit 18 to RCMSJ; Hrg Trn, 10/13/11;  Opinion and Order Setting Forth Findings of Civil Contempt, p. 5.

The reason for the requested change is the Debtor was not a party to the proceeding and he had no right to object in his personal capacity to any aspect of the Injunctive Order. He was representing Mr. Schnoor, the restrained party, at the hearing. This interchange with the State Trial Court is further evidence that neither party had reviewed the Injunctive Order by the time of the September 2, 2008 hearing. The Injunctive Order was issued with a perpetual duration and there was no need for a motion or order to adjust it.

3.      Finally, the Debtor requests that the Court substitute the rationale used by the State Trial Court as the basis for the imposition of contempt sanctions against the Debtor, rather than this Court's reference to MCL 600.1721, a statute which was never employed as a basis for the award against the Debtor. This Court cites the foregoing statute on page 8 of its Opinion as the justification for the Award against the Debtor, and it cites pages 16 and 21 of the Contempt Opinion and Order for the proposition that it was applicable. The cited page 16 relates exclusively to tort damages imposed by the state court against MSG and C&H, not the Debtor, for the purpose of compensating the Plaintiff for injury to his property. The general reference on page 21 of the Contempt Opinion and Order should equate to the same parties, and not include the Debtor. The trial court separates the analysis and treatment of the Debtor from MSG and C&H in the Contempt Opinion and Order, and the reference on page 21 to MSG and C&H, by a semi-colon. Neither the State Trial Court nor the appellate court relied upon MCL 600.1721 for the imposition of attorneys fees against the Debtor. Both state courts relied exclusively upon the case of *Davis v. Detroit Financial Review Board*[29] as the basis for the award, and the distinctions between awards premised upon MCL 600.1721 and actions premised upon "the inherent power [of Michigan courts] to punish contempt",

---

[29]*Davis v. Detroit Financial Review Team*, 296 Mich App 568, 821 NW 2d 896 (2012).

as explained in the holdings of *In re Bradley*[30], and *Electrical Workers Pension Trust Fund.*[31]

The trial court stated the award against the Debtor represented:

"...a civil contempt sanction in the form of a compensatory award of attorneys fees, other costs, or both, that Plaintiff Glenn Morris incurred in pursuing civil contempt against [the Debtor]. See Davis, 296 Mich App at 626."[32]

The State Trial Court subsequently ruled the award did not represent "damages for personal injury, property damage, or wrongful death[.]" and consequently it was not allocable under MCL 600.2957[33]

On appeal, the Debtor argued that if the award was premised upon MCL 600.1721, it should have been allocated among responsible parties under the holding of *In re Bradley*. The Court of Appeals found the argument "unavailing" and the only reasonable inference why it was "unavailing" was due to the fact the award did not represent compensation for injury to a person or property under MCL 600.1721, but rather the award represented an exercise of the inherent ability of a court to punish contempt. The appellate court quotes *In re Bradley* for the distinction between the two types of awards:

"Clearly, the punishment the Legislature authorized in MCL 600.1721, compensation for contemptuous misconduct, is not encompassed by the judiciary's inherent power to punish contempt. Because our holding only involves the GTLA's application to civil contempt petitions that seek indemnification damages under MCL 600.1721, it does not infringe on courts' inherent power to punish contempt by fine or imprisonment or both. Moreover, our definition of "tort liability" does not

---

[30]*In re Bradley*, 494 Mich 367, 835 NW 2d 545 (2013).

[31]*Electrical Workers Trust Fund of Local Union #58 v. Gary's Electrical Serv Co*, 340 F 3d 373, 385 (6th Cir 2003).

[32]Contempt Order and Opinion, p. 16.

[33]Exhibit D to Motion for Summary Disposition, p. 2-3; Exhibit E to Motion for Summary Disposition, p. 4.

encompass contempt proceedings that seek to invoke courts' inherent contempt powers; although those proceedings undoubtedly involved a noncontractual civil wrong, the sanction sought does not impose legal responsibility in the form of compensation for the harm done. [Id at 394-396 (footnotes omitted).][34]

The Opinion should be modified to reflect that the award against the Debtor represented an exercise of the trial court's inherent contempt powers to sanction contempt, rather than an award authorized under MCL 600.1721.   There is no other explanation for the appellate court's inclusion of the foregoing paragraph in the COA Opinion.

Respectfully submitted,

DUNN, SCHOUTEN & SNOAP PC
Attorneys for the Debtor David W. Charron

/s/ Perry G. Pastula
By: _____
Perry G. Pastula (P35588)
Business address:
2745 DeHoop Ave SW
Grand Rapids, MI   49509
(616) 538-6380

---

[34]P. 19, COA Opinion.

-13-