## UNITED STATES BANKRUPTCY COURT

## WESTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| In re: | Case No. 14-07970 |
| DAVID W. CHARRON | Chapter 7 |
| Debtor. | Honorable James W. Boyd |
| GLENN S. MORRIS and THE GLENN S. MORRIS TRUST, | Adversary Proceeding No. 15-80086-JWB |
| Plaintiffs, | |
| v | |
| DAVID W. CHARRON, | |
| Defendant. | |

Ronald J. Spinner (P73198)
Eric D. Carlson (P60277)
Stanley J. Stek (P29332)
Miller, Canfield, Paddock and Stone, PLC
Attorneys for Plaintiffs Glenn S. Morris and
The Glenn S Morris Trust
150 West Jefferson, Suite 2500
Detroit, MI   48226
(313) 496-7829

Perry G. Pastula ( P35588)
Dunn, Schouten & Snoap, PC
Attorneys for Debtor David W. Charron
2745 DeHoop Ave SW
Wyoming, MI   49509
(616) 538-6380

### DEFENDANT/DEBTOR DAVID W. CHARRON'S MOTION FOR RECONSIDERATION UNDER RULE 60

David W. Charron (the "Debtor"), by and through his counsel, Dunn, Schouten & Snoap,

P.C., hereby moves the Court to reconsider its Opinion Denying Defendant's Motion for Summary

Judgment and Granting Plaintiff's Cross Motion for Summary Judgment dated September 30, 2015

("Opinion") and the corresponding Order pursuant to Federal Rule of Civil Procedure 60, as made

applicable to bankruptcy courts by B R 9024.

A motion for reconsideration under Fed R. Civ. P. 60(b)(1) is appropriate when "the judge has made a substantive mistake of law or fact in the final judgment or order." *U.S. v. Reyes*, 307 F.3d 451 (6th Cir.2002)(Mich.), citing *Cacevic v. City of Hazel Park*, 226 F.3d 483, 490 (6th Cir.2000). In support of the motion, the Debtor respectfully states that this Court made substantive mistakes of law and fact by: (1) ignoring the legal consequences of the dismissal of the 2009 litigation; (2) not analyzing the only authority identified by the State Trial Court ("<u>Trial Court</u>") and the Michigan Court of Appeals ("<u>Appellate Court</u>")(collectively the "<u>Michigan State Courts</u>") for the contempt award against the Debtor: the case of *Davis v. Detroit Financial Review Team*, 296 Mich. App. 568, 821 N.W.2d 896 (2012)[1]; and by (3) fundamentally misunderstanding the debt and claims in this adversary proceeding, as well as disregarding contested issues of fact.

Plaintiff Glenn S. Morris and the Glenn S. Morris Trust (collectively the "<u>Plaintiffs</u>") unsuccessfully sued the Debtor for injuries they allegedly suffered from the sale of the assets of Morris, Schnoor & Gremel, Inc. ("<u>MSG</u>") in Kent County Circuit Court Case No. 09-01878-CB (the "<u>2009 litigation</u>"). Paragraphs 27, 28, 30, 31, 32, 33, 34, 35, 37, 39, 45, 46, 47, 48, 49, 52, 53, 54, 57, 58, 60 of the complaint highlighted the Article 9 sale by Charron & Hanisch, PLC ("<u>C&H</u>")(the "<u>Article 9 sale</u>") as the "transaction or occurrence" at the center of the 2009 litigation.[2] This Court correctly identified that the 2009 litigation was dismissed against the Debtor and affirmed on appeal; this Court, however, committed error by ignoring the significance of this dismissal.[3]

The Michigan State Courts determined as a matter of fact and law that the Debtor did not

---

[1] *Davis*, 269 Mich. App. 568 (2012) was attached as Exhibit I to the Debtor's Motion for Summary Judgment ("<u>DMSJ</u>").

[2] The complaint in the 2009 litigation was attached as Exhibit G to DMSJ.

[3] Opinion, p. 5.

-1-

cause injury to the Plaintiffs or their property by the Article 9 sale. Moreover, as a matter of law, all claims for injury to the Plaintiffs or their property by the Debtor were extinguished by the 2009 litigation and forever barred from serving as the basis for judicial relief. *Rally Hill Productions, Inc., v. Bursack*, 65 F.3d 51, 53 (6th Cir.1995); *Ed Schory & Sons, Inc. v Francis*, 226 B.R. 385, 388 (6th Cir.BAP 1998).[4]

Under Michigan law, issue preclusion applies when:

(1)     there is identity of parties across the proceedings,

(2)     there was a valid, final judgment in the first proceeding,

(3)     the same issue was actually litigated and necessarily determined in the first proceeding, and

(4)     the party against whom the doctrine is asserted had a full and fair opportunity to litigate the issue in the earlier proceeding.

*Darrah v. City of Oak Park*, 255 F.3d 301, 311 (6th Cir.2001) (citing *People v. Gates*, 434 Mich. 146, 154; 452 N.W.2d 627, 630-31 (1990)). Application of these requirements furthers the purpose of collateral estoppel, which is "to strike a balance between the need to eliminate repetitious and needless litigation and the interest in affording litigants a full and fair adjudication of the issues involved in their claims." *Storey v. Meijer, Inc.*, 431 Mich. 368, 372-73; 429 N.W.2d 169, 171 (1988)(internal citations omitted). When determining whether issue preclusion applies, this Court

---

[4]As stated by the Michigan Supreme Court in *Hackley v. Hackley*, 395 N.W.2d 906, 584-585, 426 Mich. 582 (1986), cited with approval by *In Re Shaw*, 210 B.R. 992, 997 (1997):
"In Michigan, the doctrine of res judicata applies, except in special cases, in a subsequent action between the same parties and " 'not only to points upon which the court was actually required by the parties to form an opinion and pronounce a judgment, but to every point which properly belonged to the subject of litigation, and which the parties, exercising reasonable diligence, might have brought forward at the time.'" *Curry v. Detroit*, 394 Mich. 327, 332; 231 N.W.2d 57 (1975), quoting *Gursten v. Kenney*, 375 Mich. 330; 134 N.W.2d 764 (1965)."

must "look beyond the pleadings to consider both the 'factual focus' of the prior proceedings and 'whether the party against whom collateral estoppel is asserted has had a full and fair opportunity to litigate the issue[.]'" *Livingston v. Transnation Title Insurance Co. (In re Livinqston),* 372 F. App'x 613, 617 (6th Cir. Apr. 9, 2010)(unpublished opinion)(citing *Gates,* 452 N.W.2d at 631(1990)).

There is no dispute that the parties to this proceeding are the same parties who were involved in the 2009 litigation, and that the Debtor was absolved of all liability for injury arising from the Article 9 sale.[5] There was an identity of parties across the proceedings. There was also a valid, final judgment that was affirmed by the Appellate Court. The Plaintiffs' claims did not survive the 2009 litigation and the Debtor was not ordered to pay compensation for any alleged injuries.

The issue of the Debtor's liability was actually litigated and necessarily determined in the 2009 litigation. Michigan law considers an issue "actually litigated" if it is "put into issue by the pleadings, submitted to the trier of fact for determination, and is thereafter decided." *In re Phillips*, 434 B.R. at 486 (citing *Latimer v. William Mueller & Son, Inc.*, 149 Mich. App. 620, 640, 386 N.W.2d 618, 627 (1986))(Emphasis added).[6] According to the Plaintiffs' pleadings in the 2009 litigation, the Article 9 sale was the cause of their alleged injuries:

> 27. On August 22, 2008, [the Trial Court] entered an Order precluding Schnoor from selling or transferring the assets of [MSG] except as may be permitted in the normal course of MSG, Inc.'s business.

---

[5] Opinion, p. 17-18.

[6] Under Michigan law, "[a]n issue is necessarily determined only if it is 'essential' to the judgment." *Gates*, 452 N.W.2d at 631 (1990)(citing Restatement (Second) of Judgments § 27 cmt. h (1982)).Courts apply the doctrine of issue preclusion to issues decided on summary judgment. *See* RESTATEMENT (SECOND) OF JUDGMENTS § 27 cmt. d (stating that an issue is actually litigated when it is, inter alia, "submitted for determination, and is determined" and that "[a]n issue may be submitted and determined on ... a motion for summary judgment"); 18 JAMES W. MOORE ET. AL., MOORE'S FEDERAL PRACTICE § 132.033 ("Issue preclusion generally applies when the prior determination is based on a motion for summary judgment.").

****

31.  In the course of the contempt proceedings...it was learned for the first time that on June 4, 2008, Defendant [C&H] had recorded a security interest in the assets of MSG, Inc. based on a security agreement executed on May 22, 2008, between Defendant [C&H] and Schnoor purporting to act on behalf of MSG, Inc., to secure payment of his attorney fees. All of the assets of MSG, Inc. including all contracts, receivables and intangibles were then seized by [the Debtor] and [C&H] after they filed a demand letter with MSG, Inc[.]

****

33.  The seized assets were then sold by [the Debtor] and [C&H] to Defendant New York Private Insurance Agency[.]

****

37.  After the sale of all of the assets of MSG, Inc. by [the Debtor] and [C&H] to New York Private Insurance....All the insurance contracts, insureds, relationships, and files of MSG, Inc...have now been transferred to the ownership and control of New York Private Insurance.

****

48.  [The Plaintiffs] had an interest in the assets of MSG, Inc. by virtue of the protection afforded by the Court Restraining Order Dated August 22, 2008, [their] security interest in the stock of MSG, Inc. consisting of 50% of MSG, Inc., and [their] rights under the Promissory Note.

****

49.  ...[The Debtor and C&H] damaged [the Plaintiffs].[7]

The Michigan State Courts made extensive legal and factual findings on these issues, and the Article 9 sale was essential to the judgments in the 2009 litigation.[8] The Michigan State Courts were unambiguously clear that the Debtor was not responsible for any alleged injury to the Plaintiffs

---

[7] *See* Exhibit G to DMSJ. Specifically, this Court should look at the paragraphs of the complaint that were identified on page 1 of this Motion for Reconsideration.

[8] In the opinion that dismissed the Debtor, the State Court summarized the Plaintiffs' claims as follows: "[i]n August of 2008, the Court entered an order prohibiting all extraordinary transfers of MSG assets. In spite of that order, the law firm of Charron & Hanisch seized the assets of MSG to satisfy a preexisting security interest in MSG, and Charron & Hanisch in turn transferred the assets of MSG to Defendant New York Private Insurance, LLC in November 2008. Early in 2009, the transfers of MSG assets came to light and Schnoor filed for bankruptcy protection, prompting Plaintiff Morris to file suit."(*See* Exhibit F to DMSJ, p. 2). "In essence, this suit involves a straight-forward claim by [the Plaintiffs] that the transfers of MSG assets from Schnoor to [C&H] to [NYPIA] were fraudulently undertaken to thwart Plaintiff Morris from recovering money that was rightfully his because of Schnoor's default." *Id*. p. 3.

or their property resulting from the Article 9 sale. "[The Debtor] is entitled to summary disposition on all counts[.]" (see Exhibit F to DMSJ, p. 10-11).

The Plaintiffs, the parties against whom the doctrine is asserted, actively participated in every aspect of the 2009 litigation, and had a full and fair opportunity to litigate the issues. They opposed the dismissal of the Debtor at the Trial Court and Appellate Court levels, and lost (*See* Exhibit H to the DMSJ, p. 43-44). The Plaintiffs did not appeal the dismissal to the Michigan Supreme Court; therefore, the Appellate Court's order was a final judgment that absolved the Debtor of all liability for injury to the Plaintiffs or their property as a result of the Article 9 sale. *Darrah*, 255 F.3d 301, 311 (6th Cir.2001).

The debt which is the subject of the Plaintiffs' non-dischargeability complaint arose from a show cause order dated May 19, 2011 in Case 07-06441-CR (the "Contempt Action").[9] It was issued to determine whether the Debtor and others acted in contempt of court by conducting the Article 9 sale.

"Contempt of court is a wilful act, omission or statement that tends to impair the authority or impede the functioning of the court." *In re Contempt of Robertson* (*DaVilla v. Fischer Corporation*), 299 Mich App 433, 436 (1995).[10] As noted by this Court, Michigan law does not require a "finding of will disobedience of a court order[.]" *Davis*, 269 Mich. App. at 625 (2012). Rather, a court need only "find that the [alleged contemnor] was neglectful or violated its duty to obey an order of the court." *Contempt of United Stationers*, 239 Mich. App. at 501 (2000).

---

[9] The show cause order was issued more than a year and a half after the Trial Court determined the Debtor was not liable for any injury to the Plaintiffs or their property as a result of the Article 9 sale.

[10] The primary purpose of the contempt power is to preserve the effectiveness and sustain the power of the courts. *People v. Kurz*, 35 Mich App 643, 656 (1971).

At the conclusion of the Contempt Action, the Trial Court held the Debtor and C&H in contempt. It reasoned that there was a restraining order against R. Judd Schnoor ("Schnoor"), a shareholder of MSG; the Debtor and C&H knew of the restraining order; attorneys are bound by restraining orders against their clients; and, therefore, the Debtor and C&H violated the restraining order by conducting the Article 9 sale.[11] MSG was also held in contempt.

MCL 600.1721 governs the indemnification of complainants in a contempt action:

> "If the alleged misconduct has caused an actual loss or injury to any person the court shall order the defendant to pay such person a sufficient sum to indemnify him, in addition to the other penalties which are imposed upon the defendant. The payment and acceptance of this sum is an absolute bar to any action by the aggrieved party to recover damages for the loss or injury."

In *In re Bradley Estate*, 494 Mich 367, 391-392; 835 NW 2d 545 (2013), the Michigan Supreme Court characterized MCL 600.1721 as providing "tort recovery" in contempt actions:

> "[T]his Court has implicitly recognized that the elements necessary to establish entitlement to relief under this provision are essentially the same elements necessary to establish a tort, i.e., a legal duty, breach of that duty, causation, and injury". "The first sentence of MCL 600.1721... requires that this misconduct "cause [ ]"the petitioner's actual loss or injury," thus paralleling the other two elements recognized in a traditional tort claim; causation and damages." Because the first sentence of MCL 600.1721 authorizes a court to order a contemnor to "indemnify" the petition for the loss caused by the contemptuous misconduct, the statute clearly sanctions legal responsibility, or liability, in the form of compensatory damages. Plainly, the first sentence of MCL 600.1721 contemplates what is, in essence, a tort suit for

---

[11] The Trial Court and the Plaintiffs cited no direct testimony to support the finding that C&H and the Debtor knowingly violated the restraining order. There was no exhibit introduced at trial or cited by the Trial Court in its opinion that references a plan to avoid the restraining order. The only relevant exhibit cited by the Trial Court was an acknowledgment by the Debtor that Schnoor was restrained by the restraining order. On Appeal, the Debtor and C&H argued that the exhibits cited by the Trial Court did not support its finding that the Debtor and C&H knowingly violated the restraining order (*See* Exhibit H to DMSJ, p. 5). The Appellate Court did not address the exhibits identified by the Trial Court. It reasoned that a finding of willful disobedience was not a requirement to hold the Debtor and C&H in contempt and, therefore, the actual evidence was irrelevant as long as it was shown that C&H transferred the assets during the period that the restraint was in effect against its client. *Id.* p. 9.

money damages.

> Stated differently, the plain language of MCL 600.1721 requires a showing of contemptuous misconduct that caused the person seeking indemnification to suffer a loss or injury and, if these elements are established, requires the court to order the contemnor to pay "a sufficient sum to indemnify" the person for the loss." (Emphasis added).

This Court committed error when it concluded that the Trial Court awarded damages against the Debtor pursuant to MCL 600.1721.[12] The debt in this adversary proceeding is based solely on *Davis v. Detroit Financial Review Team*, 269 Mich. App. 568 (2012), and not MCL 600.1721. The debt is not compensation for injury suffered by the Plaintiffs, but rather a penalty assessed against the Debtor for harm that the Debtor caused to the dignity of the Trial Court.

The Trial Court begins its contempt opinion by identifying MCL 600.1721 as the authority that permits courts to indemnify complainants "for actual loss or injury caused by a contemnor's misconduct." (*See* Exhibit B to DMSJ, p. 10).[13] It then cites *In re Contempt of United Stationers*, 239 Mich. App. at 500 (2000), for the position that a court may indemnify a complainant "for the actual loss or injury caused by the contemnor's misconduct." *Id*. p. 12. The Trial Court went on to state "[t]hat [this] remedy is appropriate with respect to MSG because the asset sale stripped [the Plaintiffs] of the value in [their] secured interest in 50 percent stock of MSG." *Id* (Emphasis added). The Trial Court then ordered MSG to pay 50% of the total damage award to the Plaintiffs, as compensation for the injury caused by MSG's misconduct. *Id*., FN 9.

The Trial Court followed an identical analysis when addressing the liability of C&H. It again

---

[12] Opinion, p. 24.

[13] "Having laid the factual foundation and set forth the governing legal principals, the Court must apply the law to the facts in order to determine who must be held responsible for civil contempt and measure of damages should be awarded to compensate [the Plaintiffs] for the loss resulting from the contemptuous behavior." *See* Exhibit B to DMSJ, p. 10.

cited *In re Contempt of United Stationers* for the authority to award compensation "for the actual loss or injury caused by the contemnor's misconduct." *Id.* p. 17. The Trial Court stated "[t]hat [this] remedy was [also] appropriate with respect to <u>C&H</u>, largely because C&H's seizure and disposal of all the assets of MSG stripped [the Plaintiffs] of the value in [their] secured interest in 50 percent of the stock of MSG." *Id* (Emphasis added). The Trial Court then ordered <u>C&H</u> to pay the other <u>50%</u> of the total damage award to the Plaintiffs, as compensation for the injury caused by <u>C&H</u>'s misconduct. *Id.*

The Trial Court characterized these sanctions against MSG and C&H as "redress for the harm resulting from the seizure and sale of MSG's assets in violation of the court order." *Id.*, p. 21. Collectively, they total 100% (MSG 50% + C&H 50%) of the indemnification award to the Plaintiffs. *Id.* p. 12, 17-18, FN 14.[14] Pursuant to MCL 600.1721, the Plaintiffs "[logically received] compensation for loss of value to MSG from the entities that disposed [the Plaintiffs] of that value[.]" *Id.* p. 16. These sanctions "reflect[ed] the amount of harm done to [the Plaintiffs] by the contemptuous conduct."*Id.* p. 18.

When interpreting the liability of the Debtor for contempt, on the other hand, the Trial Court did not reference MCL 600.1721, *In re Contempt of United Stationer,* compensation for "the actual loss or injury caused by the contemnor's misconduct", or any other of the standards that it applied to MSG and C&H (*See* Exhibit B to DMSJ, p. 16). Instead, the Trial Court stated that it premised the award on different authority that it possessed under the holding of *Davis v. Detroit Financial*

---

[14] The Trial Court determined that MSG had a value of $2,736,000 at the time of the Article 9 sale. *See* Exhibit B to DMSJ, p. 14. It subsequently determined that the Plaintiffs were injured in the amount of $1,368,000 because they held a "secured interest in 50% of MSG's stock[.]" *Id.* MSG and C&H were held jointly and severally liable for the $1,386,000 award that represented compensation to the Plaintiffs for the injury or "harm resulting from the seizure and sale of the assets of MSG in violation of the court order entered on August 22, 2008." *Id.*; FN 14.

*Review Board*, 269 Mich. App. 625 (2012). *Id.* The award was not compensation for "injury" resulting from the "seizure and sale of MSG's assets in violation of the court order." Rather, it was:

> "a civil contempt sanction in the form of a compensatory award of attorneys fees, other costs, or both", that [the Plaintiffs] incurred in pursuing civil contempt against [the Debtor], ***see Davis*, 296 Mich App at 625**." (*See* Exhibit B to DMSJ, p. 16)(Emphasis added).

Contrary to this Court's holding, the Trial Court never identified the award against the Debtor as compensation for "the actual loss or injury caused by the contemnor's misconduct" (*See* Exhibit B to DMSJ). The Trial Court had already determined two years earlier in the 2009 litigation that the Debtor's participation in the Article 9 sale ***did not*** cause the Plaintiffs injuries (*See* Exhibit F to DMSJ, p. 10-11). As a matter of law, all claims for injury to the Plaintiffs or their property by the Debtor from the Article 9 sale were barred from serving as the basis for judicial relief in the Contempt Action.

This Court committed palpable error by not analyzing *Davis*, the only authority used by the Trial Court to impose the debt, as well as its applicability to the Debtor. *Davis*[15] involved a citizen's claim that the Detroit Financial Review Board (the "Review Board") was subject to the Open Meetings Act ("OMA"). The trial court agreed and restrained the Review Board from meeting unless it conducted itself in accordance with the OMA. While the case was appealed, the Review Board continued to hold meetings without complying with the OMA. The Michigan Court of Appeals ("COA") agreed with the Review Board that it was not subject to the OMA and held that the injunction was invalid. Notwithstanding, the COA authorized an award of attorney fees and costs to the citizen for assisting the trial court in finding that the Review Board acted contemptuously. In other words, the citizen lost on its core claim and did not suffer a legal injury

---

[15] This case was featured prominently in the briefs and attached as Exhibit I to DMSJ.

from the actions of the Review Board; however, the citizen qualified for an award of attorney fees and costs for bringing the violation of the injunction to the attention of the trial court.

*Davis* does not require a showing that the contemnor targeted or caused a legal "injury" to the complaining party. The citizen was rewarded its attorney fees and costs for bringing a violation of a court order to the attention of the trial court. *Davis* authorized such an award as a penalty for the contemnor impairing or impeding the functioning of the court — not as compensation to the complainant for injuries caused by the contemnor.

The Trial Court equated the Plaintiffs to the citizen in *Davis*. Like the plaintiff in *Davis*, the Plaintiffs lost on their core claim that they suffered an injury by the actions of the Debtor. The Trial Court had already determined that the Debtor did not injure the Plaintiffs and these claims were barred from serving as the basis for future judicial relief.  At the same time, the Trial Court determined that the Debtor violated the restraining ordered and, therefore, it awarded attorney fees and costs against the Debtor to preserve the effectiveness and sustain the powers of the court.[16] This characterization of the award was affirmed by the Appellate Court.[17]

Any ambiguity about the meaning of the Trial Court's decision should have been resolved when the Trial Court clearly and unequivocally held on two occasions that the debt in this adversary

---

[16] Contempt has been described as a "power of self-defense," intended to sanction "those who interfere with the orderly conduct of [court] business or disobey orders necessary to the conduct of that business."  *Young v. United State ex rel Vuiton et Fils S.A.*, 481 US 787, 820-821, 107 S. Ct. 2124, 95 L. Ed. 2d 740 (1987) (Scalia, J., concurring).

[17] The Appellate Court emphasized that the Award involved the "trial court's inherent power to punish contempt[,] " as contrasted to an act by the court to "impose legal responsibility in the form of compensation for harm done." (*See* Exhibit H to the DMSJ, p. 19).  As explained by the Appellate Court's recitation of the holding of *In re Bradley*, the action against the Debtor was not a "contempt action premised in tort liability[,]" but rather an action "involving the trial court's inherent power" to award costs for a party's violation of a court order. *Id*.

-10-

proceeding was not compensation "for personal injury, property damage, or wrongful death[.]" (*See* Exhibit D, p. 2-3, and Exhibit E, p. 4, to DMSJ). Because the debt did not involve any actual injury to the Plaintiffs, the Trial Court refused to allow the Debtor to allocate the award among responsible parties, as required for all tort awards under MCL 600.2957(1).[18]

The Plaintiffs objected to the Debtor's discharge on the basis of 11 U.S.C. § (a)(6):

(a) A discharge under section 727, 1141, 1128(a), 1128(b), or 1328(b) of this title does not discharge an individual debtor form any debt - (6) for willful and malicious **injury** by the debtor to another entity or the property of another entity [.] (Emphasis added).

There was no need for this Court to wade into the disputed factual issues of whether the Debtor acted "willfully and maliciously" to cause the Plaintiffs or their property injury, as the Michigan State Courts had already determined that the Debtor did not cause injury to the Plaintiffs. Not all contempts of court involve actions that are paramount to intentional torts — the litmus test for dischargeability claims under Section 523(a)(6). *In re Geiger*, 113 F.3d 848, 852-853 (8th Cir.1997), *affirmed by Kawaahau v. Geiger*, 523 U.S. 57; 118 S.Ct. 974 (1998).[19] A contempt award involving indemnification under MCL 600.1721 and *In re Contempt of United Stationer* may qualify

---

[18]"In an action based on tort or another legal theory seeking damages for personal injury, property damage, or wrongful death, the liability of each person shall be allocated under this section by the trier of fact and, subject to 6304, in direct proportion to the person's percentage of fault." MCL 600.2957(1)."[B]y virtue of [MCL 600.]6304...a tortfeasor need only pay a percentage of the common liability that is proportionate to his fault." *Gerling Konzern Allgemeine Versicherungs AG v. Lawson*, 472 Mich. 44; 639 N.W.2d 149 (2005).

[19] "[W]hat is required for nondischargeability is a deliberate or intentional injury..this means a deliberate or intentional invasion of the legal rights of another, because the word "injury" usually connotes legal injury (*injuria*) in the technical sense, not simply harm to a person. We therefore think that the correct rule is that a judgment debt cannot be exempt from discharge in bankruptcy unless it is based on what the law has for generations called an intentional tort, a legal category that is based on "the consequences of the act rather than the act itself." *In re Geiger*, 113 F.3d 848, 852-853 (8th Cir.1997), affirmed by the United States Supreme Court, *Kawaahau v. Geiger*, 523 U.S. 57; 118 S.Ct. 974 (1998)(Emphasis added).

because the debt involves indemnification for "the actual loss or **injury** caused by the contemnor's misconduct." A contempt award under *Davis* does not qualify as a non-dischargeable claim because it is awarded in the absence of any proven **injury** by the contemnor to the complainant.  A *Davis* award rewards a complainant with fees and costs for the value of the service it provided to the court, as a good citizen.

The Plaintiffs' complaint objecting to discharge alleged the following as the sole basis for its objection:

"93.    [The Plaintiffs'] <u>security interest in MSG's stock</u> constitutes a <u>property</u> interest.

94.    [The Debtor] thus willfully and maliciously caused injury to [the Plaintiffs'] <u>property</u>."

****

"96.    Because [the Debtor] willfully and maliciously caused injury to [the Plaintiffs'] <u>property</u>, [the Debtor] is not entitled to a discharge pursuant to 11 U.S.C. § 523(a)(6)." (Emphasis added).

The Plaintiffs' complaint should have been dismissed as a matter of law because there was no genuine issue of material fact that its allegations were untrue. The Trial Court concluded in the 2009 litigation that the Debtor did not injure the Plaintiffs or their <u>property</u>. This Court should vacate the Opinion and Order Denying Defendants's Motion for Summary Judgment and Granting Plaintiffs' Cross Motion for Summary Judgment, dismiss Plaintiffs' complaint, and grant summary judgment in favor of the Debtor.

UNEXPECTED CHANGE OF COURSE

Instead of ruling on the pleadings filed by the Plaintiffs and the summary judgment motion premised upon such pleadings, this Court rewrote the Plaintiffs' complaint and summary judgment motion to allege a new claim for "willful and malicious injury" by the Debtor against the "person" of the Plaintiffs. In other words, this Court transformed the "debt" represented by the contempt

-12-

award into the "injury" suffered by the Plaintiffs.[20]  This extraordinary action by the Court ignored the rules for summary judgment motions under Fed R. Civ P Federal Rule of Civil Procedure 12(a)(4) and 56; and Federal Rule of Bankruptcy Procedure 7056. In essence, this Court unilaterally amended the Plaintiffs pleadings to state a new claim without prior notice to the Debtor, or the opportunity to respond to or defend the claim. This Court then identified all relevant facts and created reasoning to support the new Court-created claim.

The Plaintiffs have the burden to show by a preponderance of the evidence that their non-dischargeability claim fits squarely within the exception to discharge. *Grogan v. Garner*, 498 US 279, 287; 111 S. Ct. 654 (1991). When deciding a motion for summary judgment, this Court is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50, 105 S. Ct. 2505, 2511 (1986).  All facts and related inferences are to be viewed in the light most favorable to the non-moving party.  *Id.* at 255.  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no "genuine issue for trial."" *Matsushita Elec. Indus. Co. V. Zenith Radio Corp.*, 475 US 574, 587, 106 S. Ct. 1348, 1356 (1986) (citation omitted). Further, when this Court reviews counter-motions for summary judgment, it "must evaluate" each motion on its own merits and view all facts and inferences in the light most favorable to the nonmoving party. *Wiley v. United States (In re Wiley)*, 20 F.3d 222, 224 (6th Cir 1994).

This Court gave no deference to any conflicting factual statements that the Debtor submitted in opposition to the claims in the Plaintiffs' Counter Motion for Summary Judgment — the claims

---

[20] Instead of the "injury" being the injury to their property (i.e., the stock interest in MSG), as alleged by the Plaintiffs, this Court equated the "injury" the Plaintiffs suffered to be the attorneys fees and costs they incurred in the process of bringing the contempt action against the Debtor.

-13-

the Debtor thought it was defending.  As discussed below,  all factual inferences were made in favor of the Plaintiffs.[21]

The new claim against the Debtor begins with a fundamental misunderstanding of the holding of *Cohen v. de la Cruz*, 523 U.S. 213, 118 S.Ct. 1212 (1998). In *Cohen*, the Supreme Court considered whether § 523(a)(2)(A) prevents a discharge of all liability arising from a debtor's fraud that is assessed as a matter of state law, such as treble damages, attorney fees and costs. The Supreme Court explained that "debt for" — when used throughout § 523 — is used "to mean 'debt as a result of', 'debt with respect to', and 'debt by reason of', and the like." Accordingly, when §523(a)(2)(A) is "construed in the context of the statute as a whole," the Supreme Court explained, "§523(a)(2)(A) is best read to prohibit the discharge of any liability arising from a debtor's fraudulent acquisition of money, property, etc., **including an award** of treble damages **for the fraud**." *Id*. at 215 (Emphasis Added).  Punitive treble damages, attorney fees and costs, in addition to compensatory damages, were all recoverable against the debtor in *Cohen* because they all resulted from the Debtor's fraud. The fraud came first, then the debt recoverable from the fraud.

The Supreme Court went to great lengths to describe how §523(a)(2)(A) contains the same phrase "debt for" as §523(a)(6). This Court — when applying the standard to this adversary proceeding — should have interpreted the phrase in the same manner as the Supreme Court by substituting "willful and malicious injury" for "fraud" or "fraudulent acquisition of money, property, etc." If this Court had done this, it would have concluded that the operative element in any §523(a)(6) analysis is "injury". The "debt" must be a "debt as a result of", a "debt with respect to", or a "debt by reason of" — "injury". The corollary to this analysis is that "injury" must precede the

---

[21] The Debtor's factual allegations should have been sufficient to defeat the new claim created by this Court or, at the very least, created a fact dispute that warrants a trial.

"debt" in order for the "debt" to result from "<u>injury</u>". The "injury" is not "the debt", but rather what results in "the debt". Once it is determined that there is an "<u>injury</u>", the court may then determine whether the "injury" was "willful and malicious".

As discussed above, in the 2009 litigation the Debtor was judicially determined to have caused no injury to the Plaintiffs from the Article 9 sale.  In the Contempt Action, there was no award against the Debtor for injury to the Plaintiffs. Consequently, the Plaintiffs' adversary proceeding should have been dismissed.

This Court committed error by reasoning that "the debt" was the "injury" suffered by the Plaintiffs. [22] As discussed extensively in this Court's opinion, a debtor's "willful and malicious" intentions may be inferred from the mere disobeyance of a court order. This Court's reasoning effectively changes §523(a)(6), in the context of a contempt award, to read in relevant part:

**"any ~~injury~~ debt [owed] by the debtor to another entity ~~or the property of another entity~~"**

In other words, this Court only requires a complainant to prove the existence of a debt to have it declared non-dischargeable under §523(a)(6).The consequence of this Court's reasoning is that all contempt awards are non-dischargeable. The problem with the analysis is that Congress never exempted all contempt awards from discharge.[23] It only exempted certain contempt fines made payable to a governmental authority (under §523(a)(7)); or debts resulting from "willful and

---

[22] Similar to how the Supreme Court first required "fraud", this Court should have first required an "injury". If there is no prior "injury" by the Debtor, there can be no later "debt for" the injury. The words "willful" and "malicious" modify the word "injury", meaning the debt must represent compensation for a willful and malicious injury to the person or the property of the person objecting to the discharge. *Kawaahau v. Geiger*, 523 U.S. 57, 61; 118 S.Ct. 974 (1998); *In re Kinzey*, 761 F.2d 421, 424 (7th Cir.1985). Injury is an "<u>intentional invasion of the legal rights of another</u>...not simply harm to a person." *In re Geiger*, 113 F.3d 848, 852-853 (8th Cir.1997), affirmed by *Kawaahau v. Geiger*, 523 U.S. 57 (1998)(Emphasis added).

[23] Congress did not believe all court orders and judgments were sacrosanct.

-15-

malicious <u>injury</u>" to another entity or its property. This proceeding involves a penalty made payable to a private party that is not for an injury; the debt is therefore not exempt from discharge.

There was no factual support in the Michigan State Courts' opinions for the conclusion that the Debtor acted wilfully and maliciously to cause the Plaintiffs to incur attorneys fees and costs to try the Debtor for contempt, i.e., the injury that this Court identifies. The required causation link borders on absurdity. This Court does not even attempt the analysis; instead, it uses statements from the Michigan State Courts' opinions that pertained exclusively to the Article 9 sale as the event which caused the "injury" to the Plaintiffs. This was error as the Michigan State Courts held the Debtor was not responsible for injury to the Plaintiffs arising from such event.

Exceptions to discharge under section 523(a) are supposed to be narrowly construed in favor of debtors in order to promote the Bankruptcy Code's policy of providing debtors with a fresh start. *In re Nicodemus*, 497 B. R. 852, 857-858 (2013) . There should have be no dischargeability analysis under §523(a)(6) when there is a prior judicial determination that the Debtor's contemptuous act did not injure the Plaintiffs.[24] The outcome of the 2009 litigation forever barred these claims from serving as the basis of a recoverable injury. *Darrah*, 255 F.3d 301, 311 (6th Cir.2001). The debt in this action represents compensation for assisting the Trial Court in finding the Debtor in contempt; it was not compensation for an injury suffered by the Plaintiffs.

It is evident that the way this Court viewed the holdings of *Suarez v. Barrett* (*In re Suarez*), 400 B.R. 732 (9th Cir.B.A.P.2009) and *In re Musilli*, 379 F. App'x 494 (6th Cir.2010) significantly impacted the Opinion. The Debtor suggests that this Court view these cases in another way that it

---

[24] For the statute to be applicable, the Debtor's actions must be: (1) willful, (2) malicious, and (3) result in injury to another entity or the property of another entity. *Kawaauhau v. Geiger*, 523 U.S. 57, 61, 118 S.Ct. 974 (1998); *In re Kimzey*, 761 F.2d 421, 424 (7th Cir.1985). The Plaintiffs are required to prove <u>all</u> three elements to have a non-dischargeable debt.

is more congruent with the holding of *In re Geiger*.

At the core of both cases was tortious and/or criminal behavior that targeted the complainants for harm. This conduct also occurred independently of the contempt action. *Musilli* is essentially a conversion case involving monies that belonged to another law firm which were unlawfully converted by a restrained law firm and its members.[25] *Suarez* involved the intentional infliction of emotional distress upon the new wife of the debtor's ex-husband. The motivations for the conduct of both sets of debtors were clear: they wanted to hurt someone and to some degree, benefit themselves.   What is unique about both cases is that the tortious/criminal events which ultimately caused injury played out in real time before a trial court judge — in advance of the ultimate injury. Acts or suspicions about the intended conduct of the debtors initiated a judicial proceeding that resulted in hearings to determine whether the debtors or related parties should be restrained from performing the prohibited conduct. After some due process, there was a judicial determination that the complainants were likely to suffer irreparable harm by the actions of the debtors and, as a result, the debtors were restrained by name from performing specific conduct. This is important because:

> "[N]o court can make a decree which will bind any one but a party; **a court of equity is as much so limited as a court of law; it cannot lawfully enjoin the world at large, no matter how broadly it words its decree.  If it assumes to do so, the decree is pro tanto brutum fulmen, and the persons enjoined are free to ignore it**.  Thus, the only occasion when a person not a party may be punished, is when he has helped bring about, not merely what the decree has forbidden, because it may have gone too far, but what it has power to forbid, **an act of a party**. "  *Alemite Mfg Corp. v. Staff*, 42 F.2d 832, 833 (2d Cir. 1930).  *Emphasis added*

The restraints against the actions of the debtors in *Musilli* and *Suarez* were clear, specific and unambiguously tailored to the debtors. The debtors in *Musilli* knew that they could not cause their

---

[25] In the 2009 litigation, the Plaintiffs sued the Debtor for conversion and lost (Opinion, p. 23-24).  This is another important distinction between this adversary proceeding and *Musilli*. Unlike *Musilli*, the Michigan State Courts determined the debtor did not injure the Plaintiffs.

restrained law firm to avoid the escrow; the debtor in *Suarez* knew that it could not harass its ex-husband's new wife. The courts left no possibility of misunderstanding about what conduct was required to avoid the wrath of the court. The bankruptcy courts quoted the restraints and reasons for the restraints from orders and hearing testimony in their opinions. Because the restrained parties participated in the proceedings as parties, enjoyed the protections of the federal rules of civil procedure, were named as restrained parties and were orally cautioned about their potential behavior by the court on the record of the proceedings, there was no genuine issue of material fact that the debtors had knowledge that they were substantially likely to cause injury to the complainant if they disobeyed the courts' directives. When confronted by the courts, none of the debtors had any explanation for why their behavior was motivated by anything other than malice. The court ordered the *Musilli* debtors to restore the escrow monies they took. When the behavior of the debtor in *Suarez* did not stop, it was imprisoned for criminal contempt and ordered to pay the attorney fees of the complainant, as mandated under a domestic relations statute that is unique to California.

In both cases, the restraining orders assisted the courts in proving the "wilful and malicious" element involved with the complainants behavior under §523(a)(6). The trial courts were at the center of both sets of tortious/criminal behavior. The courts used their prior judicial findings and the existence of the violated restraining orders to create an evidentiary "short cut" for "malice". Violation of the conduct proscribed in the restraining orders — that resulted from lengthy judicial processes that followed applicable court rules — was sufficient to imply malice. This is because the restrained parties had an opportunity to participate in the identification of the "injury" before the "injury" occurred, and the trial courts had determined there was a "likelihood of irreparable harm"[26]

---

[26] *See, Pontiac Fire Fighters*, 482 Mich. 1, 8-9; 753 N.W.2d 595 (2008): injunctive relief "is an extraordinary remedy at law that issues only when justice requires, there is no adequate remedy at law, and there exists a real and imminent danger of irreparable harm."

— a well known element for issuing the injunction in the first place. These former judicial determinations have similarities to the "substantial likelihood of harm" threshold that was subsequently used to imply "malice" in the §523(a)(6) actions.

The facts required for the judicial "short cut" were never present in this case.[27] The Debtor's conduct was not the reason for the restraining orders issuance in the first place. The Debtor's client, Schnoor, had refused to make payments on a promissory note to the Plaintiffs. There is nothing inherently tortious or criminal about not paying a promissory note. The restraining order was issued against Schnoor, not the Debtor, at a hearing to determine whether Schnoor should be held in contempt for not making payments on the promissory note after being ordered to do so.[28] Schnoor was given an opportunity to oppose the restraining order, but he consented to a temporary measure for "a week or two" as a matter of expediency (*See* Exhibit 21 to DRCM). This is because Schnoor had opposed all of the extraordinary relief leading up to and including the contempt proceeding — on the basis that all of the Plaintiffs claims had been dismissed in the action and they held no basis for equitable relief — and he was ignored. The Trial Court eventually restrained Schnoor from transferring the assets of MSG indefinitely, without explanation.[29] The Trial Court did not restrain any other party or even MSG from transferring its own assets (*See* DRCM Exhibit 1; DMSJ Exhibit 5, p. 5: "R. Judd Schnoor— not MSG — owed the financial obligation to [the Plaintiffs][.]"). MSG is mentioned elsewhere in the same order, but absent from the restraint. The Debtor was not a party

---

[27] The following factual recitations are based upon the affidavit of the Debtor submitted in support of summary judgment and against Plaintiffs Cross-Motion for Summary Judgment, as well as the factual content of the briefs which the Debtor attested to be true.

[28] *See* Exhibit 1 to the Debtor's Reply to Counter-Motion for Summary Judgment and Memorandum in Support Thereof ("DRCM"); DRCM, p. 1-7.

[29] There was a dispute about the actual duration and validity of the injunction.

to the proceeding and he was never told not to perform any act. The Debtor was never told he was restrained by the restraining order. The Debtor never targeted the Plaintiffs for harm.

There are no fact findings or explanations in the record of the case for what the Trial Court intended with the restraint. There was no complaint or counter-claim filed by the Plaintiffs to use as a measure. There were no findings about the likelihood of irreparable harm. There is no explanation why the Trial Court gave the Plaintiffs — parties with no plead claims in the action — an injunction, let alone an injunction for an indefinite duration (*See* DRCM, Exhibit 1, 21).[30] Michigan Court Rule 3.310, which governs restraining orders, was not followed by the Trial Court. The contempt proceeding against Schnoor (that served as the context of the restraining order) was ultimately dismissed on the merits (*See* DRCM, p. 6). The Trial Court held that the Plaintiffs had an adequate remedy at law that barred equitable relief, i.e., a money judgment on their promissory note. *Id*. The same reasoning, if applied six months earlier, would have barred the issuance of the restraining order (as well as the order granting specific performance of a promissory note that resulted in the order to show cause) from the offset. The Trial Court subsequently issued a $2,267,187.72 judgment against Schnoor, resulting in Schnoor filing for bankruptcy protection (*See* DRMC, p. 7). Schnoor received a discharge on May 17, 2010. *Id*., Exhibit 22.[31] The Trial Court never explained why the restraining order remained in effect after the dismissal of the Schnoor

---

[30] Unlike the other cases, the restraining order in this case arose at a time when the Plaintiffs held no claims against another party: all of their claims in Case 07-06441-CR had been dismissed a year before the restraint with prejudice (*See* Exhibit 2 to DRCM).

[31] The Plaintiffs did nothing to lift the stay of Schnoor's bankruptcy proceeding to pursue Schnoor for contempt of court associated with the Injunctive Order and Plaintiffs did nothing to challenge the dischargeability of the promissory note at the center of this dispute. The Trial Court noted: "Judd Schnoor filed for bankruptcy protection on January 28, 2009, and so [the Plaintiffs] have conceded that Mr. Schnoor is shielded from civil liability in this matter." (*See* DMSJ, Exhibit B, FN 1).

contempt action, nor after the issuance of the money judgment against Schnoor. When the Debtor appeared at an evidentiary hearing on February 9, 2009 to testify about the sale of MSG assets, neither the Trial Court or the Plaintiffs asserted that the restraining order applied to the Debtor or C&H, or that it had been violated by the Article 9 sale (*See* DRCM, Exhibit 27). Everyone knew that the Debtor and C&H had represented Schnoor at the time of the Article 9 sale.

Unlike the debtors in *Musilli*, the Debtor had a legitimate reason to be dealing with the assets of MSG.  C&H was a secured creditor of MSG and enjoyed rights under a security agreement that predated the issuance of the injunction. C&H knowingly sold the assets of MSG at the Article 9 sale to satisfy an undisputed debt owed by MSG to C&H. The Debtor and C&H were not named as a restrained parties in the order.  Even the Trial Court recognized "C&H had an interest as a secured creditor that was superior to the interest of [the Plaintiffs]. Thus, when C&H seized the collateral that secured its right to recovery from MSG and passed on the collateral to [New York Private Insurance Agency], it acted within its rights as a secured creditor." (*See* DMSJ, Exhibit F, p. 9).

Both C&H and the Debtor believed that MSG's obligations to C&H were either exempted from the restraining order because neither of them were "Schnoor"[32], or exempted because the actions were expressly authorized in the security agreement between C&H and MSG that was executed in MSG's ordinary course of business to ensure legal representation. The Debtor testified that he never did and still does not believe that the sale caused harm to the Plaintiffs because they held no interest in the assets of MSG at the time of the restraining order or the Article 9 sale  (*See* DRCM, Exhibit A, Exhibit 24). ***The absence of Plaintiffs' interest in the assets of MSG was one reason why the Plaintiffs conversion claim involving the same incident was dismissed against the***

---

[32]Under the Trial Court's reasoning, if Schnoor had been enjoined from going to the Cedar Point amusement park with his family, the Debtor was enjoined from going to Cedar Point with his family because the Debtor was Schnoor's attorney.

***Debtor and MSG in the 2009 litigation.***  The Plaintiffs did not own the assets or have a lien against the assets.  They were not creditors or shareholders of MSG. Their interest was limited to a security interest in 50% of the stock of the corporation held by Schnoor.

The Plaintiffs never presented evidence at trial that their collateral interest in the stock was impaired by the sale.  There is no "before and after"  valuation of the stock interest in the Trial Court's opinion (*See* DMSJ, Exhibit B). The Trial Court simply assumed the Plaintiffs' stock interest was impaired because the Article 9 sale transferred MSG's assets to the purchaser.[33]

The Debtor testified that the MSG stock interest which the Plaintiffs held as collateral was worthless prior to the Article 9 sale because the Plaintiffs had transferred (40%) percent of the corporation's annual income to their new insurance agency, and they gave nothing in return to the corporation (*See* DRCM, Exhibit A, Exhibit 24). There were no non-competition or non-solicitation agreements to prevent the Plaintiffs or another producer like Schnoor from taking the assets of MSG.[34] The income of the corporation could easily leave the company when all producers and other company employees departed. The Plaintiffs had demonstrated just how easily this could happen.

The Debtor also testified that it and C&H went to great lengths to avoid harm to anyone from the conduct of the sale (*See* DRCM, p. 10-11). The sale did not occur until all settlement negotiations between the Plaintiffs and C&H's clients had concluded; the law firm has exhausted its $250,000 credit lines to carry litigation for MSG; MSG's debt to its senior secured creditor, Fifth Third Bank, was set to become due in full;  Schnoor's imminent bankruptcy filing made any renewal of the senior secured debt unlikely; the Plaintiffs vowed to make sure that C&H never got paid on

---

[33] The Trial Court ignored the corporation's debts which approached $2.8 million at the time of the Article 9 sale.

[34] The Debtor also knew MSG had stopped  paying its bills in the regular course and was being evicted from its corporate offices at the Promenade of Rockford.

its junior debt; C&H's other clients were not paying their debts to the firm; MSG was being evicted; and world capital markets were collapsing and world credit markets froze in the Fall of 2008.

All of these factual elements differentiate the current action from *Musilli* and *Suarez*. The debtors in those cases had no explanation for their motivations other than malice. The Debtor had ample reasons for acting the way it did, and none of the reasons involved the Plaintiffs or its desire to harm the Plaintiffs. The fact that the Debtor's legal opinion about the propriety of its actions, or the actions of C&H and MSG, later proved to be wrong in the eyes of the Michigan State Courts does not mean that it acted with malice toward the Plaintiffs.[35]

If this Court does not dismiss the Plaintiffs' Complaint for the reasons discussed above, this Court should at least vacate its Opinion and Order and conduct a trial to resolve the disputed factual issue of whether the Debtor's actions were motivated to cause intentional harm to the Plaintiffs. This Court gave no deference to the Debtor's attested factual statements made in opposition to the Plaintiffs' summary judgment motion. It was premature for this Court to use the evidentiary "short cut" afforded by *Musilli* and *Suarez* to deny the Debtor's right to a trial when the Debtor contested the factual basis of the claim and provided plenty of valid reasons for its actions that did not involve malice towards the Plaintiffs. The Plaintiffs hold the burden of proof on this issue, not the Debtor.

<u>CONCLUSION</u>

For the reasons identified in this motion, the Debtor respectfully requests that the Court vacate the Opinion and Order Denying Defendants Motion for Summary Judgment and Granting Plaintiff's Cross Motion for Summary Judgment entered on September 30, 2015, grant the Debtor's

---

[35] The Michigan State Courts even noted that the Debtor did not believe its behavior was wrong or in violation of the restraining order: "[t]he trial court's reference to the December 2008 exchange comprised merely an observation that [the Debtor] did not view his behavior as being in violation of the [restraining] order." (*See* DMSJ, Exhibit H, p. 17).

-23-

Motion for Summary Judgment, and dismiss the Plaintiffs' Complaint in its entirety.  If this Court declines to grant the Debtor's Motion for Summary Judgment for any reason, the Debtor requests that this Court vacate its Opinion and Order and hold a trial on all disputed factual issues.

Respectfully submitted,

DUNN, SCHOUTEN & SNOAP PC
Attorneys for the Debtor David W. Charron

Dated: November 2, 2015                    /s/ Perry G. Pastula
                                    By: _____
                                           Perry G. Pastula (P35588)
                                    Business address:
                                           2745 DeHoop Ave SW
                                           Grand Rapids, MI   49509
                                           (616) 538-6380

-24-